MARION O. HOUCHINS AND JUNE A. HOUCHINS, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8890–79.     Filed September 29, 1982.

*E. David Kemp and Jack R. Leonard*, for the petitioners.
*Roger D. Osburn*, for the respondent.

Wiles, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1975 | $8,431 |
| 1976 | 6,498 |
| 1977 | 5,079 |

The issue for decision is whether petitioners are entitled to miscellaneous deductions claimed in connection with an investment in a cattle-breeding program.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Marion O. Houchins (hereinafter petitioner) and June A. Houchins, husband and wife, resided in Orlando, Fla., when they filed their 1975, 1976, and 1977 joint Federal income tax returns with the Office of the Director, Southeast Internal Revenue Service Center, Chamblee, Ga., and when they filed their petition in this case.

### *Investment in Simmental Cattle-Breeding Program*

From 1944 through 1971, petitioner served in the U.S. Army and Air Force. He retired in May 1971. In September 1970, approximately 9 months prior to his retirement, petitioner began a used car business in Orlando, Fla., under the name "Action Motors." From 1971 through 1974, both petitioner and his wife devoted their full time to the used car business, developing it into a very profitable venture. In 1974, petitioner made a $35,000 profit from the used car business,[1] and he expected his income therefrom to increase. In 1975, petitioner acquired a new car franchise from Datsun. He operated the Datsun dealership from a separate location in Kissimmee, Fla., using the name "Action Datsun." The Datsun dealership has been very successful.

Petitioner developed his interest in cattle breeding at an automobile auction in 1974. During the course of the day, he had lunch with Dave Dawson, a friend and the general manager of a Toyota dealership, and they both boasted about their success in the automobile business. At that time, Mr. Dawson told petitioner about his investment in a Charolais cattle-breeding program in Fort Myers, Fla., and they discussed the tax benefits available from such an investment. Thereafter, petitioner contacted the promoters of the Charolais cattle-breeding program and considered making an investment therein. Prior to this time, petitioner had absolutely no experience with respect to raising or breeding cattle.

In the meantime, petitioner mentioned the Charolais cattle-breeding program to his insurance broker, Charles Skinner, and Mr. Skinner told him that he should consider investing in a local Simmental cattle-breeding program marketed by Florida Simmental Farms, Inc. (hereinafter FSF), and Simmental Management Services, Inc. (hereinafter SMS). Mr. Skinner was not financially involved in the Simmental cattle-breeding program, but was a friend of one of the promoters, Bryan W. Judge. Mr. Skinner arranged for petitioner and his bookkeeper to have lunch with Mr. Judge, at which time Mr. Judge explained the basics of his breeding program to petition-

---

[1]The record does not indicate the amount of petitioner's income from other sources during 1974.

er. During a subsequent meeting, Mr. Judge explained the breeding program in greater detail, gave petitioner some literature regarding Simmental cattle, and showed him a brochure projecting the consequences of an investment in the breeding program (hereinafter referred to as the projection). The literature given to petitioner included a pamphlet entitled "Florida Simmental Farms Presents Cattle Management Service," published to promote the breeding program, and a magazine entitled "The Simmental Story," published by the American Simmental Association (hereinafter ASA). The magazine published by the ASA discussed the different types of Simmental cattle and the background and characteristics of the breed. Petitioner was also shown periodicals which listed the prices of Simmental cattle sold at auction in the United States and Canada. Most of the cattle were selling for prices of approximately $1,000.

The principal individuals behind the breeding program marketed by FSF and SMS were Mr. Judge and Gene Folck, both of whom had been involved in the cattle industry for many years. Mr. Judge was the president of both FSF and SMS. The projection had been prepared to promote the breeding program. It assumed a purchase of four bred one-half-Simmental-blood cows for $40,000. FSF would finance the entire purchase price, and SMS would maintain, manage, and breed the herd for 6 consecutive years under a fee schedule provided in the projection. The projection set forth the chart on page 574 summarizing the consequences of an investment in the breeding program.

For the end of each year of the program, the projection set forth the following estimates of herd value:

1st Year: 4 × $2,500 = $10,000

2d Year: 4 × 2,500 = 10,000
2 × 4,000 = 8,000
18,000

3d Year: 4 × 2,500 = 10,000
2 × 4,000 = 8,000
2 × 7,500 = 15,000
33,000

4th Year: 4 × 2,500 = 10,000
2 × 4,000 = 8,000
4 × 7,500 = 30,000
1 × 10,000 = 10,000
58,000

## TOTAL ALLOWABLE DEDUCTIONS

|              | 1st year* | 2d year | 3d year      | 4th year | 5th year | 6th year |
|--------------|-----------|---------|--------------|----------|----------|----------|
| Depreciation | $9,996    | $7,504  | $5,628       | $4,240   | $6,324   | $6,308   |
| Interest     | 1,250     | 2,800   | 2,800        | 2,800    | 2,800    | 2,800    |
| Maintenance  | 6,000     | 2,400   | 4,000 [sic]  | 4,000    | 5,000    | 12,000   |
| Management   | 4,000     | 4,000   | 4,000        | 4,000    | 5,000    | 12,000   |
|              | 21,246    | 16,704  | 15,428       | 15,040   | 19,124   | 33,108   |

## BREEDING HERD PROGRAM

| Depreciation | Interest | Maintenance and breeding fees | Management fees | Total allowable deductions | Total cash required | Total number of cattle (before sale) | Total number of cattle (after sale) | Sales proceeds¹ after capital gains tax |
|--------------|----------|-------------------------------|-----------------|----------------------------|---------------------|---------------------------------------|-------------------------------------|------------------------------------------|
| 1. $9,996        | $1,250 | $6,000 | $4,000 | $21,246    | $11,250 | 4  | 4  | 0         |
| 2. 7,628 [sic]   | 2,800  | 2,400  | 4,000  | 16,704     | 9,200   | 8  | 6  | $1,500    |
| 3. 5,628         | 2,800  | 3,000  | 4,000  | 15,428     | 9,800   | 10 | 8  | 1,500     |
| 4. 4,240         | 2,800  | 4,000  | 4,000  | 15,040     | 10,800  | 14 | 11 | 2,250     |
| 5. 6,324         | 2,800  | 5,000  | 5,000  | 19,124     | 12,800  | 19 | 15 | 3,000     |
| 6. 6,308         | 2,800  | 12,000 | 12,000 | **33,108   | 26,600  | 26 | 21 | ***5,000  |

* Investment Tax Credit² is illustrated on Tax Benefit & Cash Flow Summary.

** Deductions is an excess of $25,000/yr. will be recaptured as ordinary income upon sale of assets.

*** Capital gains tax not completed [sic] because of possible herd sale during 6th year.

¹ FSF guaranteed to purchase all male offspring for $1,000 each.

² The projection stated that the purchaser would be entitled to an investment tax credit of $1,876.

5th Year: 4 × $2,500 = $10,000    6th Year: 4 × 2,500 = $10,000
          2 × 4,000 = 8,000              2 × 4,000 = 8,000
          6 × 7,500 = 45,000             .8 × 7,500 = 60,000
          2 × 10,000 = 20,000            3 × 10,000 = 30,000
          1 × 12,500 = 12,500            3 × 12,500 = 37,500
                       95,500            1 × 20,000 = 20,000
                                                     165,500

The above estimates of herd value were based upon the following value and growth projections:

| Type of animal[1] | Simmental blood | Value |
|---|---|---|
| Bred cow (Br.) | ½ | $2,500 |
| Open cow (Op.) | ¾ | 4,000 |
| Br. | ¾ | 7,500 |
| Op. | ⅞ | 10,000 |
| Br. | ⅞ | 12,500 |
| Op. | Pure | 20,000 |

ESTIMATED HERD GROWTH

| Year | ½ Br. | ¾ Op. | ¾ Br. | ⅞ Op. | ⅞ Br. | Pure cow | Total cows |
|---|---|---|---|---|---|---|---|
| 1st | 4 | | | | | | 4 |
| 2d | 4 | 2 | | | | | 6 |
| 3d | 4 | 2 | 2 | | | | 8 |
| 4th | 4 | 2 | 4 | 1 | | | 11 |
| 5th | 4 | 2 | 6 | 2 | 1 | | 15 |
| 6th | 4 | 2 | 8 | 3 | 3 | 1 | 21 |

[1] A bred cow is one that has been impregnated while an open cow is one that has not been impregnated.

The projection stated that the estimates of herd value and growth were calculated (1) without considering mortality factors; (2) assuming a reproduction rate of 100 percent (50-percent male and 50-percent female); and (3) using conservative market values from 1972, 1973, and 1974.

Finally, the projection summarized the tax consequences and cash flow from an investment in the breeding program as shown in table 1 on pages 576–577.

On June 30, 1974, petitioner, as buyer, and FSF, as seller, executed a document entitled "Sales Agreement" (hereinafter

TABLE 1

| Year | | | | | | |
|---|---|---|---|---|---|---|
| *Taxable income* | *1st* | *2d* | *3d* | *4th* | *5th* | *6th* |
| **$36,000** | | | | | | |
| Tax savings | $9,267 | $6,157 | $5,776 | $5,653 | $6,835 | $9,907 |
| Program outlay | 11,250 | 9,200 | 9,800 | 10,800 | 12,800 | 26,800 |
| Cash flow | (1,983) | (3,043) | (4,024) | (5,147) | (5,965) | (16,893) |
| Bull income | 0 | 1,500 | 1,500 | 2,250 | 3,000 | 5,000 |
| Accumulated cash flow | (1,983) | (3,526) | (6,050) | (8,947) | (11,912) | (23,805) |
| **$52,000** | | | | | | |
| Tax savings | 11,762 | 8,016 | 7,463 | 7,288 | 9,032 | 13,990 |
| Program outlay | 11,250 | 9,200 | 9,800 | 10,800 | 12,800 | 26,800 |
| Cash flow | 512 | (1,184) | (2,337) | (3,512) | (3,768) | (9,849) |
| Bull income | 0 | 1,500 | 1,500 | 2,250 | 3,000 | 5,000 |
| Accumulated cash flow | 512 | 828 | (9) | (1,271) | (2,039) | (9,849) |
| **$76,000** | | | | | | |
| Tax savings | 13,376 | 9,093 | 8,417 | 8,211 | 10,376 | 17,492 |
| Program outlay | 11,250 | 9,200 | 9,800 | 10,800 | 12,800 | 26,800 |
| Cash flow | 2,126 | (107) | (1,383) | (2,589) | (2,424) | (9,308) |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Bull income | 0 | 1,500 | 1,500 | 2,250 | 3,000 | 5,000 |
| Accumulated cash flow | 2,126 | 3,519 | 3,636 | 3,297 | 3,873 | (435) |
| **$88,000** |  |  |  |  |  |  |
| Tax savings | 13,922 | [1]7,547 | 8,845 | 8,632 | 10,878 | 19,593 |
| Program outlay | 11,250 | 9,200 | 9,800 | 10,800 | 12,800 | 26,800 |
| Cash flow | 2,672 | (1,653) | (955) | (2,168) | (1,922) | (8,413) |
| Bull income | 0 | 1,500 | 1,500 | 2,250 | 3,000 | 5,000 |
| Accumulated cash flow | 2,672 | 2,519 | 3,064 | 3,146 | 4,224 | 811 |
| **$100,000** |  |  |  |  |  |  |
| Tax savings | 14,439 | 9,928 | 9,188 | 8,963 | 11,332 | 19,169 |
| Program outlay | 11,250 | 9,200 | 9,800 | 10,800 | 12,800 | 26,800 |
| Cash flow | 3,189 | 728 | (612) | (1,837) | (1,468) | (7,631) |
| Bull income | 0 | 1,500 | 1,500 | 2,250 | 3,000 | 5,000 |
| Accumulated cash flow | 3,189 | 5,417 | 6,305 | 6,708 | 8,250 | 5,619 |

[1] This figure is incorrect; the correct amount is $9,547. Since the tax savings for the period is understated by $2,000, the cash flow for such period and the remaining accumulated cash flow figures are similarly understated.

sales agreement) whereby petitioner agreed to purchase four head of bred one-half-Simmental-blood cows[2] from FSF for $40,000.[3] In conjunction with the execution of the sales agreement, petitioner also entered into a management agreement with SMS. Finally, as part of the same transaction, he executed a promissory note and a security agreement. Mr. Judge acted on behalf of both FSF and SMS in consummating this transaction with petitioner. All of the above documents were executed on the same date, June 30, 1974. Prior to the execution of the sales agreement, petitioner had never spoken to anyone who knew anything about Simmental cattle other than Mr. Judge; he never attempted to obtain an independent appraisal of the program.

Under the sales agreement, the purchase price that petitioner agreed to pay for the four bred one-half-Simmental-blood cows was payable as follows:

4. Buyer agrees to pay to Seller a total purchase price of FORTY THOUSAND AND NO/100 DOLLARS ($40,000.00), (the "Purchase Price") for the Basic Herd. The Purchase Price shall be payable as follows:

(a) Principal in the sum of FORTY THOUSAND AND NO/100 DOLLARS ($40,000.00), plus interest at the rate of six and one-quarter percent (6¼%) per annum from the date hereof through December 31, 1974, and thereafter at the rate of seven percent (7%) per annum shall be paid in the following manner:

An amount equal to one hundred percent (100%) of the total net proceeds (gross sales price less commissions, sales costs and expenses and brokerage fees) resulting from the sale of animals in the Herd, with the exception of bull offspring culled from the Herd from time to time, as such animals shall be sold pursuant to the terms of that certain Management Agreement by and between Maker and Simmental Management Services, Inc., of even date herewith, shall be applied to the reduction of principal, until said principal shall be paid in full. Interest accrued on the unpaid principal balance shall be paid quarterly on or before the last day of each quarter (March 31, June 30, September 30 and December 31). Payments of interest shall be deemed to have been made only upon the receipt thereof by Florida Simmental Farms, Inc., its successors and assigns.

(b) As evidence of the indebtedness set forth hereinabove, Buyer agrees to execute a Promissory Note of even date herewith, a copy of which is attached hereto as Exhibit "B." Said Note shall provide that commencing on January

---

[2]Each cow was pregnant with a three-quarter-Simmental-blood calf as a result of being bred with a full-blood Simmental bull.

[3]Petitioner received a bill of sale dated June 28, 1974.

1, 1977, Buyer shall have no personal liability of any kind whatsoever thereunder, and that as of the aforesaid date the holder of the Note upon default shall look only to the collateral (the Herd) and the Buyer shall have no personal liability for any deficiency.[4]

The sales agreement also provided that petitioner would grant FSF a security interest in the herd as "collateral security" for his obligations thereunder, and he agreed to execute and deliver a security agreement to FSF.

Pursuant to the promissory note executed by petitioner, he promised to pay FSF the principal sum of $40,000 in the manner set forth in the sales agreement.[5] The promissory note also incorporated the terms of the security agreement by reference and provided that it would become immediately due and payable at the option of the holder upon petitioner's default in the performance of any of his obligations under the note itself, the security agreement, or the sales agreement.

The sales agreement stated that the four cows purchased by petitioner had been registered with the ASA and that FSF would notify the ASA that the cows had been sold to him. The sales agreement also represented that the cows sold to petitioner had been bred.[6] Under the sales agreement, FSF agreed to replace cows comprising the herd as follows:

3. Seller agrees that in the event that one or more of the heifers comprising the Herd dies for any reason whatsoever, commencing on the date hereof through December 31, 1976 at 12:00 P.M., Seller shall replace the deceased heifer and its deceased replacement, if applicable, with another heifer of approximately the same age, condition and value. Seller shall not be responsible for the replacement of the animals comprising the Herd subsequent to the date and time specified above. All animals substituted for the Basic Herd shall become part of the Basic Herd and carry the same warranties as those heifers comprising the original Basic Herd.

FSF also agreed to pay $1,000 for each bull culled from the herd during the term of the management agreement.

---

[4]The sales and management agreements referred to the four cows purchased by petitioner as the "Basic Herd," while referring to the four cows and all offspring thereof as the "Herd." In discussing the terms of the sales, management, and security agreements, we shall use the same terminology.

[5]The promissory note also provided that petitioner's personal liability would expire as of Jan. 1, 1977.

[6]A guarantee to replace a nonbreeder is a common practice in the registered cattle industry.

The sales agreement specifically provided that "there have been no representations or warranties, express or implied, of any nature whatsoever except as expressly set forth herein" and stated that the sales and management agreements represent the entire understanding between the parties. It also recited that the buyer was fully aware of the speculative nature of an investment in breeding cattle. In addition, it indicated that the buyer had reviewed the projection and warned that the various projections set forth therein were subject to certain risk factors, enumerating the following:

7. * * *

(a) *Management of Herd*: Pursuant to the terms of the Management Agreement, Buyer will be relying for the management of the Herd upon the continued existence of Simmental Management Services, Inc. and its ability to manage and maintain the cattle satisfactorily. In the event that Simmental Management Services, Inc. is for some reason unable to perform pursuant to the Management Agreement, the Buyer would be forced to either sell the Herd, which, in the early years of ownership, can be expected to be at a substantial loss, or to find another organization to manage the Herd, at whatever cost and expense this might entail.

(b) *Sale of Herd*: A herd sold or disposed of relatively early after its acquisition cannot normally be expected to be sold for a price comparable to the initial cost. * * *

(c) *Other Breeds*: * * * No assurance can be given, however, that some other existing breed or breeds that may be developed will not have characteristics preferable to the Simmental breed.

(d) *Prices of Breeding Cattle*: The prices of breeding cattle depend on a number of factors, including particularly pedigree, ordinary supply and demand factors, conformation and other physical characteristics a buyer may wish to acquire, and the prices at which these animals may be bought and sold may vary significantly from time to time. In the opinion of the Seller and Simmental Management Services, Inc., the prices of breeding stock, however, do not fluctuate nearly as much as commercial beef prices, and except in the case of material changes in commercial beef prices over an extended period of time, prices of breeding stock would not normally be affected by fluctuations in commercial beef prices. In addition, any substantial increase in the number of animals retained for breeding purposes may over a period of time reduce the price such animals now command in the market.

(e) *Calving Rate*: An important factor in the economic success of operating a herd is its calf crop. In the opinion of Simmental Management Services, Inc., based on prior individual cattle raising experience, properly managed female cattle two (2) years of age or more will calve approximately ninety percent (90%) of their number each year, with approximately fifty percent (50%) male and fifty percent (50%) female. This general ninety percent (90%) calving rate for all breeds nationally is confirmed by recent

government reports. The proper management necessary to the attainment of a high calving rate in Simmental cattle includes the careful administration of breeding procedures and the close supervision over heifers during the calving season. However, there is no assurance that the calving rate of the cattle purchased by Buyer will not vary from the foregoing ninety percent (90%) rate and male-female mix. Furthermore, while there is no reliable information available as to the percentage of calves nationally reaching weaning age each year, it is possible that weather conditions or diseases particularly affecting young animals might in some cases reduce a herd owner's annual weaned calf crop to eighty percent (80%) or seventy percent (70%).

(f) *Accidents and Disease*: Cattle are subject to a wide variety of diseases and accidents and Simmental Management Services, Inc. does not plan to provide insurance against such risks. A Buyer will receive limited protection from such risks by reason of the replacement provisions for the Herd as set forth in paragraph 3 of this Agreement. Simmental Management Services, Inc. will carry insurance against death of the cattle comprising the Basic Herd and the female offspring thereof, from fire, lightning, windstorm and like calamities in an amount sufficient to cover replacement costs, which insurance shall be in effect through December 31, 1976 at 12:00 P.M. In the event that Buyer desires to continue such insurance coverage commencing on January 1, 1977, the cost thereof must be borne by Buyer and must be paid in advance to Simmental Management Services, Inc.

(g) *Culled Animals*: It will become necessary from time to time to cull certain of the animals from the Herd. Such animals will include all bulls, infertile progeny, animals whose progeny are not likely to be worth the expense of maintenance, and animals that produce progeny with undesirable traits and characteristics that should be eliminated from the Herd. Culled animals will generally be sold for beef, and their realizable value will, therefore, be less than that of quality animals. Seller's and Simmental Management Services, Inc. replacement policy does not extend to infertile progeny or other culled animals.

(h) *Herd Growth*: To the extent that a Herd's progeny consists of a disproportionate number of bulls, the Herd will grow at a slower rate and will generally have less value. * * *

While the sales agreement specifically stated that petitioner and SMS were entering into a management agreement which provided for the maintenance, management, and breeding of the four cows and all offspring thereof, it also provided that petitioner could purchase the cows without entering into the management agreement if he paid the full purchase price in cash. In addition, at any time after the execution of the sales agreement, FSF agreed to turn the herd over to petitioner upon written notice from him to SMS and full payment of the purchase price. In the event that petitioner decided to remove the herd from the care and maintenance of SMS, the sales

agreement provided that he would release FSF from all obligations under both the sales and management agreements.

Under the management agreement, SMS agreed "to breed, care for, maintain, feed, transport and provide whatever is necessary, including, without limitation, medical services and facilities" to petitioner's herd. In addition, SMS agreed to counsel and advise petitioner with respect to the timely sale of animals, the retention of offspring, the incorporation of offspring in the breeding program, and the culling of bulls and nonbreeding heifers from the herd. As stated in paragraph 7(f) of the sales agreement, SMS promised to carry insurance against the death of cattle from fire, lightning, windstorm, and like calamities in an amount sufficient to cover replacement costs through December 31, 1976. The management agreement also provided that SMS would maintain various records with respect to the herd which would be open to inspection and would make annual reports to petitioner on the status of the herd.

In exchange for (1) "the maintenance and breeding services" and (2) "the management and counseling services" to be performed by SMS under the management agreement, petitioner promised to pay the following fees:

|  | Fees | |
|---|---|---|
|  | Maintenance and breeding | Management and counseling |
| 6/30/74—12/31/74 | $6,000 | $4,000 |
| 1/ 1/75—12/31/75 | 2,400 | 4,000 |
| 1/ 1/76—12/31/76 | 3,000 | 4,000 |
| 1/ 1/77—12/31/77 | 4,000 | 4,000 |
| 1/ 1/78—12/31/78 | 5,000 | 5,000 |
| 1/ 1/79—12/31/79 | 12,000 | 12,000 |

To secure his obligations under the management agreement, petitioner agreed to grant SMS a security interest in the herd.

With respect to the control and sale of the herd, the management agreement provided as follows:

15. Subject to the express provisions contained herein, and so long as this Agreement is in effect or the Note (as defined in the Sales Agreement) or any part thereof remains unpaid, Simmental Services, its successor and assigns, shall have full and absolute control of the location, maintenance, expansion, breeding and culling of the Herd which constitutes the collateral security for

such Note. * * * With the exception of the absolute and unqualified discretion vested solely in Simmental Services to cull animals from the Herd from time to time as Simmental Services deems appropriate, all sales of animals from the date hereof through December 31, 1978, shall be subject to the written approval of Owner. * * * Commencing on January 1, 1979, Simmental Services shall have absolute and unqualified discretion without Owner's written authorization to sell animals from the Herd from time to time as Simmental Services in its sole opinion deems appropriate, unless this Agreement is sooner terminated. Simmental Services hereby acknowledges that unless Owner shall terminate this Agreement by entering into some other management agreement and by paying all fees and expenses due pursuant to this Agreement and the Note, it is the intention of Simmental Services to sell all of the animals comprising the Herd on or before December 31, 1979.

The management agreement specified that the net proceeds realized upon the sale of animals from the herd would be distributed in the following manner:

(a) Commencing on the date of execution hereof, Florida Simmental Farms, Inc. as Seller under the terms of the Sales Agreement shall receive one hundred percent (100%) of all net proceeds until such time as the principal sum due under the Note shall be paid in full.

(b) Commencing on the date that the Purchase Price specified in the Sales Agreement is paid in full to Florida Simmental Farms, Inc., an amount equal to one hundred percent (100%) of the total net proceeds, as defined in the Sales Agreement, shall be paid by Simmental Services to Owner.

(c) The net proceeds from the sale of bulls culled from the Herd during the course of the preceding calendar year shall be paid to Owner on or before the first day of February of each year during the term of this Agreement.

The management agreement provided that it would terminate when the liquidation sale of the herd had been completed, but gave SMS the option to sooner terminate the agreement by giving 90 days' written notice at any time after the promissory note had been paid in full. In addition, SMS had the option to automatically terminate the management agreement, without notice, upon petitioner's failure to pay amounts due under the promissory note or the management agreement itself.

Finally, the management agreement stated that any default by the owner thereunder would constitute a default under the sales agreement, promissory note, and security agreement. The management agreement also incorporated by reference the provisions of paragraph 7 of the sales agreement, wherein the risks of the subject investment were set forth in detail.

Pursuant to the security agreement, petitioner assigned the herd to FSF and SMS in order to secure the performance of his

obligations under the sales agreement, promissory note, and management agreement. The security agreement stated that the following events would constitute a default by petitioner:

(i) nonpayment when due whether by acceleration or otherwise of the principal of or interest on any indebtedness secured by this agreement, time being of the essence, or failure by Debtor to perform any other obligation under this agreement or under any other agreement between Debtor and Secured Party; (ii) filing by or against Debtor of a petition in bankruptcy or for reorganization under the Bankruptcy Act or for an arrangement under the Bankruptcy Act; (iii) making a general assignment by Debtor for the benefit of creditors; the appointment of a receiver or trustee for Debtor or for any of Debtor's assets; or the institution by or against Debtor of any kind of insolvency proceedings or any proceeding for the dissolution or liquidation of Debtor; (iv) discovery that any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor was false in any material respect when made or furnished.

The security agreement provided that FSF and SMS could declare all or any part of the indebtedness secured thereby to be due immediately upon petitioner's death or the happening of any event of default.

All of the cows sold to petitioner under the sales agreement were registered with the ASA. After the execution of the sales agreement, such cows were thenceforth identified as part of petitioner's herd pursuant to FSF's records, as were the offspring of such cows. The ASA registration of the cows, however, remained solely in the name of FSF.

SMS sent annual reports to petitioner which set forth the breeding status of the herd and the calf crop. The annual reports showed that the herd had the following numbers of female calves in the years set forth below:

| Years | Female calves born |
|---|---|
| 1974–75 | 3 |
| 1976 | 2 |
| 1977 | 2 |
| 1978 | 2 |
| Total | 9 |

During the course of the management agreement, FSF purchased 10 bull calves from petitioner for $1,000 each. In addition, FSF purchased 2 three-quarter-blood heifers from petitioner for $4,000 each, the value that had been placed on such animals in the projection given to petitioner. Petitioner

used the proceeds of these sales to reduce the principal amount of the promissory note to $22,000. He made these principal payments because his bookkeeper had advised him that it was necessary due to the at-risk rules.

From 1975 through 1978, petitioner wrote checks to FSF and SMS for payments which were characterized pursuant to the sales and management agreements as follows:

|      | Maintenance and breeding fees | Management and counseling fees | Interest | Principals[1] |
|------|------|------|------|------|
| 1975 | $2,400 | $4,000 | $2,800 | |
| 1976 | 3,000 | 4,000 | 2,800 | $3,000 |
| 1977 | 4,000 | 4,000 | 2,660 | 7,000 |
| 1978 | 5,000 | 5,000 | 2,100 | 8,000 |

[1] The principal payments were made at the very end of each of the respective years.

For purposes of this proceeding, the parties have agreed to the following schedule of reasonable maintenance and management expenses:

| Age of animal | Annual maintenance and management expenses |
|------|------|
| Mature ............................... | $600 |
| 6 to 15 months ...................... | 400 |
| Birth to 6 months ................... | 0 |

In May 1980, FSF sold petitioner's herd of cattle through a broker for $11,000, netting $8,400 to $8,500 after the brokerage fees.[7] There were 22 cattle in the herd, 19 females and 3 males. Such cattle were not sold as registered Simmentals, but as commercial cattle at commercial prices. At the time of the sale, petitioner had not paid any maintenance and management fees for approximately 1½ years, and the principal balance due on the promissory note stood at $22,000.

### Background and Valuation of Simmental Cattle

Simmental cattle comprise the most populous breed of cattle in continental Europe. During the 1960's, the Canadian Government established quarantine stations to facilitate the importation of European cattle into North America, and the

---

[7] Petitioner first learned that the herd had been sold during the trial of this case.

first Simmental, a bull, was imported into Canada in 1967. Prior to that time, a quarantine for hoof and mouth disease had prevented the importation of cattle from continental Europe into North America.

After the importation of Simmental cattle began, the unavailability of adequate numbers of purebred cattle caused both the ASA and the Canadian Simmental Association to initiate programs whereby cows of other breeds were bred to purebred Simmental bulls and the female progeny registered as one-half Simmental. Succeeding generations also sired by purebred bulls would be eligible for registration as three-quarter Simmental, seven-eighths Simmental, and purebred. Both associations recognized the seven-eighths female and fifteen-sixteenths male as purebreds. The purpose of the upgrading program was to allow the rapid creation of a large number of purebred Simmental cattle. In addition, the ASA recognized what is known as "open A.I." whereby a Simmental breeder could mate his cows to the best bulls of the herd through artificial insemination. Since the ASA did not require a special breeding certificate or ownership of the sire, this represented a significant advantage to the average breeder and furthered the growth of the Simmental breed in the United States.

Generally, the purpose of a registered breeding herd is to improve and propagate registered seedstock that are needed by the commercial beef cattle producer. Although the registered cattle breeding market is dependent upon the beef cattle market, the price movements of the two markets are not parallel. Traditionally, the prices of registered cattle do not change direction as quickly, but rather tend to increase and decrease at a later time than beef cattle prices. The price of registered cattle is usually unaffected by short-term fluctuations in beef cattle prices.

Petitioner was one of six individuals who invested in the breeding program marketed by FSF and SMS. A total of 28 one-half-Simmental-blood cows were sold to such individuals pursuant to the breeding program. FSF acquired most of those one-half-Simmental-blood cows, including the cows sold to petitioner, for prices ranging from $700 to $2,000 at auctions held throughout the United States and Canada. FSF had purchased at least one of the cows sold to petitioner for as little

as $900. Although the market for Simmental cattle in Florida was limited, FSF had bought and sold Simmental cattle in Florida for prices approximating those it had paid for Simmental cattle purchased at auctions held in other States.

As the lowest level of the ASA upgrading program, one-half-Simmental-blood cows had certain limitations that affected their values. First, since halfbloods could not produce a purebred, they did not have the ability to produce an animal of extraordinary value. Second, as more animals of a higher or purebred level became available, the value of halfbloods would automatically decrease. Finally, since a breeder could use any cow as a base and was allowed to use open A.I., the qualitative differences among halfblood cows was limited. While there would undoubtedly be some difference between the qualities of individual animals, it would be nothing like the variations in pedigree and value that were possible at the purebred level.

In 1973, the commercial beef cattle market took a drastic dip which was not reflected in the registered Simmental cattle market until the fall of 1974. In June 1974, a bred one-half-Simmental cow had a fair market value in the range of $1,500 to $2,500. By late 1974, however, the prices of registered Simmental cattle had dropped, and a good one-half-Simmental cow that had been bred had a fair market value in the range of $450 to $800.

The Simmental cattle values relied on in the projection reflected the top selling prices for the specified types of Simmental cattle in early 1974. Such values never constituted a realistic projection of the values that the specified types of Simmental cattle would have upon the expiration of the management agreement. First, the 1974 prices reflect both a relative scarcity of purebred and high percentage Simmental cattle at that point in time and the fact that the Simmental breed was a glamorous new breed in North America. Second, no consideration was given to the ASA upgrading program which was designed to quickly increase the population of purebred Simmental cattle in the United States. It was anticipated that by the early 1980's, the Simmental would be a purebred breed in the United States rather than an upgrading breed and would have a price structure paralleling that of the other purebred breeds where only the extraordinary breeding animal can command a price in excess of $10,000.

By June 1980, Simmental cattle had arrived as a purebred breed in the United States. While an extraordinary purebred Simmental cow could sell for a price in excess of $10,000, many purebred cows with calves at side were selling for prices of $1,100.

## Tax Returns and Notice of Deficiency

On their 1975, 1976, and 1977 tax returns, petitioner and his wife reported income of $61,120, $62,334.48, and $86,592.15, respectively. For those years, petitioner claimed the following deductions attributable to the Simmental cattle-breeding program:

| Item | 1975 | 1976 | 1977 |
|---|---|---|---|
| Management and maintenance fees | $6,400 | $7,000 | $8,000 |
| Interest | 2,800 | 2,800 | 2,660 |
| Depreciation | 8,748 | 6,564 | 4,920 |
| | 17,948 | 16,364 | 15,580 |
| Less income | 0 | 3,000 | 7,000 |
| Total loss claimed | (17,948) | (13,364) | (8,580) |

In the notice of deficiency, respondent disallowed the deductions claimed by petitioner in connection with the Simmental cattle-breeding program.

### OPINION

We must decide whether petitioner is entitled to the deductions claimed in connection with his investment in the Simmental cattle-breeding program.

Respondent contends that petitioner is not entitled to any of the claimed deductions because the investment in the breeding program lacked economic substance and was entered into solely for tax purposes without any profit motive within the meaning of section 162[8] or section 212.[9] Relying on *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg.

---

[8]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue.

[9]Respondent has not argued that sec. 183 is applicable to the instant case.

64 T.C. 752 (1975), respondent also argues that petitioner is not entitled to the claimed deductions because he never acquired an investment in the cattle or incurred a genuine indebtedness to purchase the cattle.

Petitioner, on the other hand, maintains that his investment in the breeding program was motivated by the significant potential for economic gain set forth in the projections shown to him. Furthermore, petitioner asserts that *Estate of Franklin v. Commissioner, supra,* is distinguishable and that the rationale relied on therein is inapplicable to the instant case. Consequently, petitioner insists that he is entitled to the deductions claimed in connection with his investment in the cattle-breeding program. For the reasons set forth below, we disagree with petitioner and hold for respondent.

We do not believe that petitioner's investment in the cattle-breeding program constituted a sale of the cattle to petitioner. At best, the substance of the transaction herein at issue was the purchase by petitioner of an option to acquire a breeding herd. The purported sale of the cattle to petitioner and the labels attached to the payments he made to FSF and SMS constituted a transaction engaged in solely to create artificial tax benefits, thereby increasing the attraction of the investment as a tax shelter and reducing its costs at the expense of the U.S. Treasury while reaping handsome profits for the promoters.

It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935); *Derr v. Commissioner,* 77 T.C. 708 (1981). Although a taxpayer is entitled to reduce his taxes by any means that the law allows, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering,* 293 U.S. 465, 469 (1935). The labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties. *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978); *Estate of Franklin v. Commissioner,* 64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976). In *Frank Lyon Co. v. United States,*

*supra* at 572–573, the U.S. Supreme Court provided a summary of these principles which we find particularly relevant:

> This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378, 50 S. Ct. 336, 74 L. Ed. 916 (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 68 S. Ct. 715, 92 L. Ed. 898 (1948); *Helvering v. Clifford*, 309 U.S. 331, 60 S. Ct. 554, 84 L. Ed. 788 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," *Commissioner of Internal Revenue v. Tower*, 327 U.S. 280, 291, 66 S. Ct. 532, 538, 90 L. Ed. 670 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering v. Lazarus & Co.*, 308 U.S. at 255, 60 S. Ct. at 210. See also *Commissioner of Internal Revenue v. P.G. Lake, Inc.*, 356 U.S. 260, 266–267, 78 S. Ct. 691, 2 L. Ed. 2d 743 (1958); *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 334, 65 S. Ct. 707, 89 L. Ed. 981 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 286, 80 S. Ct. 1190, 4 L. Ed. 2d 1218 (1960).

In order to determine the substance of the transaction before us, all of the documents executed by petitioner in entering the transaction must be considered together. The record reveals that both FSF and SMS were under the direction and control of Mr. Judge and that the agreements between petitioner and both entities were entered into contemporaneously pursuant to a preconceived plan. The documents, themselves, demonstrate their interdependence. After carefully reviewing these documents and the attendant circumstances, we are convinced that the transaction herein under consideration did not constitute a sale.

Generally, a sale is a transfer of property for money or a promise to pay money. *Commissioner v. Brown*, 380 U.S. 563, 570–571 (1965). For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under State law. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981);

*Derr v. Commissioner, supra* at 723. The question of whether the benefits and burdens of ownership have been transferred is essentially one of fact to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. *Grodt & McKay Realty, Inc. v. Commissioner, supra.* Among the factors to be considered in making this determination are: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1237–1238.[10] Upon considering these criteria and others, we find that the benefits and burdens of ownership of the four Simmental cows were not transferred to petitioner.

To the extent that petitioner ever acquired legal title to the four cows, such title was meaningless. Although petitioner received a bill of sale from FSF, he assigned the herd (the four cows and their offspring) to FSF and SMS pursuant to the terms of the security agreement. Furthermore, the record establishes that FSF continued to represent itself as the record owner of the herd. The sales agreement specified that FSF would notify the ASA that the four cows had been sold to petitioner. Nevertheless, FSF never notified the ASA, and the registration of the cows remained solely in the name of FSF. Mr. Judge testified that the registration was not changed to facilitate FSF's sale of the cattle. Thus, notwithstanding the fact that the cattle comprising petitioner's herd were identified as such on FSF's records, FSF did represent itself as the owner of the herd to third persons, and we have little reason to doubt that petitioner recognized this fact.

Moreover, petitioner has failed to prove that he ever acquired any equity in the cattle, either at the time of the alleged sale or subsequent thereto. Petitioner agreed to pay a price of $10,000 for each of the four cows even though the

---

[10]See also *Hunter v. Commissioner,* T.C. Memo. 1982–126.

projection itself indicated that they were only worth $2,500 each.[11] Accordingly, we believe that petitioner knew he was agreeing to pay a purchase price far in excess of the value of the cows. Due to the excessive purchase price and our determination that petitioner did not incur a bona fide recourse liability with respect thereto, we conclude that petitioner acquired no equity in the cows at the time he executed the sales agreement.

In attempting to explain the purchase price that he agreed to pay under the sales agreement, petitioner maintains that he was buying more than the four cows. Rather, he contends that he was purchasing a "package" that included not only the four cows, but also included various warranties and guarantees and the selection of the cows and their transportation to Florida where there was no established market in Simmental cattle. Petitioner insists that a purchase price of $40,000 is reasonable because he was required to pay a premium to the promoters for marketing a valuable investment package (which encompassed all of the components of the breeding program, including the maintenance and management of the cattle) that would not have been available otherwise.

Upon careful consideration of all the evidence presented herein, we find that the four cows purportedly purchased by petitioner did not have a fair market value in excess of $2,500 each. Petitioner's attempts to explain a purchase price of $10,000 each for those cows was wholly unsatisfactory. Petitioner's expert was particularly unconvincing. He testified that a price of $10,000 for each of the four cows and the guarantees provided by FSF were reasonable without any real explanation for this conclusion. Petitioner's expert made no attempt to value the individual components of the purported package to which petitioner has ascribed such importance, but simply referred to some of the same components cited by petitioner in attempting to justify his valuation. In addition, his credibility became suspect when his own records revealed that he had overstated the average price he paid for one-half-Simmental-blood cows during 1974. In short, we cannot accord any weight to the testimony of petitioner's expert.

---

[11]In addition, the sales and management agreements both stated that the sale of the herd in the "early years of ownership" would probably be at a "substantial loss."

On the other hand, we found respondent's expert, Colville C. Jackson, Jr., a forthright and knowledgeable witness. He testified that a "safe valuation" of bred one-half-Simmental-blood cows would be in the range of $1,500 to $2,500 at the time of the sale, a valuation that is amply supported by evidence in the record with respect to the selling prices of such cattle during 1974. On the basis of Mr. Jackson's testimony and the prices paid by FSF for the cows in question, we believe that a valuation of $2,500 per cow is indeed fair and even generous. None of the arguments advanced by petitioner support a fair market value in excess of $2,500 per cow.

It is impossible to account for the purchase price that petitioner agreed to pay on the basis of the quality of the animals themselves. Regardless of the quality of the cows allegedly sold to petitioner, there were inherent limitations upon the value of one-half-Simmental-blood cows. Since a breeder could use any cow as a base and was allowed to use open A.I., the range of qualitative differences among one-half-Simmental-blood cows was limited. In addition, one-half-Simmental-blood cows lacked the potential to produce an animal of extraordinary value because they could not produce a pureblood animal. Moreover, the value of one-half-Simmental-blood cows was certain to decline as a result of the ASA upgrading program.

In addition, we are unable to find that the costs that FSF incurred in selecting and transporting the cows to Florida should be reflected in a higher valuation. Generally, such costs are a component of fair market value. See *Lemmen v. Commissioner*, 77 T.C. 1326, 1351 (1981). While there was not an extensive market for Simmental cattle in Florida, the record shows that FSF bought and sold Simmental cattle in Florida for prices in the same range as those it paid for the Simmental cattle it purchased in other States. Moreover, as with all the other additional costs that petitioner has attempted to inject into our determination of the fair market value of the cows, petitioner failed to even suggest what portion of the purchase price was allocable to the cost of selecting and transporting the cows to Florida.

It is also apparent from a consideration of the record that the purportedly valuable warranties and guarantees provided by FSF have little substance. The sales agreement represented

that each of the cows sold to petitioner had been bred. Since the record indicates that a warranty to replace a nonbreeder is a common practice in the industry, such a representation adds nothing to the established fair market value of the cows. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1239. In addition, petitioner has asserted that FSF did not simply represent that the cows had been bred, but also guaranteed that each cow would give birth to a live calf. We must reject this contention because it is clearly contrary to the terms of the sales agreement. Thereunder, FSF did agree to replace any of the heifers comprising the herd that died before midnight December 31, 1976, but the sales agreement does not contain any guarantee that the cows purchased by petitioner would give birth to live calves and, in fact, specifies that "there have been no representations or warranties, express or implied, of any nature whatsoever except as expressly set forth herein."[12]

Furthermore, the replacement guarantee, itself, represents insurance against the risk of death, an item which we believe is more appropriately characterized as a cost of managing or maintaining the cattle. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1239. Accordingly, we cannot find that the cost of this guarantee should be considered a component of the cost of the cattle.[13] Similarly, we have a difficult time understanding why FSF's agreement to purchase bull calves for $1,000 each should be considered a part of the cost of the cattle since the sale of bull calves is obviously associated with the ongoing management of the herd. In this context, it is important to note that petitioner agreed to release FSF from all of its obligations under both the sales and management agreements in the event that he removed the herd from the care and maintenance of SMS. Even if we believed that such an item should be considered in valuing what petitioner purchased pursuant to the sales agreement, we could not

---

[12]Although the sales agreement defines the term "herd" to include offspring, we cannot, as petitioner does, read the term "offspring" to include an unborn calf. Certainly, if FSF had intended to guarantee a live calf, the sales agreement would have so stated in a more plausible fashion.

[13]Even if we considered the replacement guarantee a part of the cost of the cattle, the record indicates that insurance against the risk of death would have only cost approximately $300 per cow for the term of the replacement guarantee.

include its cost in our estimate of fair market value in the instant case. First, petitioner did not attempt to establish the value of this item. Second, and more importantly, we are convinced that the bull calf payments were intended to reduce the excessive fees payable under the management agreement, while, at the same time, appearing to give petitioner the benefits of ownership.

Under the management agreement, petitioner promised to pay the following fees:

### FEES

| Year | Maintenance and breeding | Management and counseling | Total |
|------|------|------|------|
| 1974 | $6,000 | $4,000 | $10,000 |
| 1975 | 2,400 | 4,000 | 6,400 |
| 1976 | 3,000 | 4,000 | 7,000 |
| 1977 | 4,000 | 4,000 | 8,000 |
| 1978 | 5,000 | 5,000 | 10,000 |
| 1979 | 12,000 | 12,000 | 24,000 |
| | | | 65,400 |

The parties, however, have agreed to a schedule of maintenance and management expenses that clearly shows that such fees were excessive. On the basis of the expense schedule agreed to by the parties, the following represents an approximation of reasonable maintenance and management expenses for the herd over the 6 years of the Simmental cattle-breeding program assuming either an 80-percent or a 100-percent reproduction rate:[14]

---

[14]We have adopted this approximation of reasonable maintenance and management expenses from a computation made by respondent on brief. These figures have been prepared under the assumption that each heifer calf crop is born on March 1. Therefore, in the year each heifer calf is born, there will be no maintenance and management expenses incurred during the first 8 months of the year (the 2 months before the calf is born and 6 months after birth). For the remaining 4 months of the year, the maintenance and management expenses would equal $133 ($400 × one-third of a year). In the second year, each heifer born to the herd is assumed to be under 15 months of age for 5 months during which maintenance and management expenses would equal $166 ($400 × five-twelfths of a year), while maintenance and management expenses for the remainder of the year would be $350 ($600 × seven-twelfths of a year), for a total of $516.

Reproduction rate

| Year | 80 percent | 100 percent |
|------|-----------|-------------|
| 1 | $1,200 | $1,200 |
| 2 | 2,666 | 2,666 |
| 3 | 3,565 | 3,698 |
| 4 | 4,515 | 5,031 |
| 5 | 6,014 | 6,880 |
| 6 | 7,564 | 9,462 |
| Total | 25,524 | 28,937 |

Consequently, petitioner agreed to pay maintenance and management fees in excess of 2 times the amount that would have been reasonable. Furthermore, the projection incorporated the bull calf payments as an integral element of the accumulated cash flow summary set forth therein, thereby effectively reducing the breeding program's cash requirements. The agreed-to bull calf payments of $1,000 each, however, represent an arbitrary figure that does not bear any relationship to the value of the bull calves, themselves. Under these circumstances, we find ourselves compelled to conclude that the bull calf payments were intended to reduce the excessive maintenance and management fees.[15]

We also refuse to accept petitioner's attempt to characterize a portion of the purchase price as a premium paid to the promoters for putting the cattle-breeding program together. We think that this argument can only be described as an afterthought. It appears that petitioner first articulated the argument on brief after realizing that the record did not support a valuation of the identifiable elements of the alleged sale anywhere near the purchase price of $40,000. Petitioner's own expert did not indicate that he had considered any such premium in computing the valuation he submitted to the Court. Even Mr. Judge did not refer to a premium in attempting to explain the purchase price, but rather relied on the cost of selecting and transporting the cattle, an argument that we have already rejected. Furthermore, to the extent that petitioner's premium argument represents an attempt to

---

[15]Although petitioner actually used the bull calf payments to make principal payments, he did so due to subsequent developments. See note 21 *infra*.

characterize a portion of the purchase price as an additional charge for the subsequent maintenance and management of the cattle, we need only state that the fees payable under the management agreement were considerably more than adequate.[16]

Not only has petitioner failed to prove that he acquired an equity in the cows at the time he executed the sales contract, but he has also failed to establish that he acquired an equity at any time thereafter. The value and growth estimates set forth in the projection given to petitioner were unrealistic. The herd growth projections were based on a reproduction rate of 100 percent, while the sales agreement stated that a reproduction rate of 90 percent was standard in the industry and admitted that a 70 or 80 percent was possible. Moreover, the value projections reflect the selling prices of Simmental cattle in early 1974. It was inappropriate to use the 1974 prices as projections because such prices reflected both a scarcity of purebred and high percentage Simmental cattle and the novelty of the recently introduced breed, a situation that

---

[16]Petitioner relied on *Bernuth v. Commissioner*, 57 T.C. 225 (1971), affd. 470 F.2d 710 (2d Cir. 1972), in arguing that a portion of the purchase price was allocable to a premium paid to the promoters. In *Bernuth*, the taxpayer had made an investment in an oil venture which consisted of both a working interest and a drilling contract. In disallowing a portion of a claimed intangible drilling expense deduction, respondent determined that the taxpayer had paid an excessive price for the drilling contract, and the Court sustained his determination due to the taxpayer's failure to introduce any evidence to the contrary. The Court found that the excess could have represented a premium paid to the promoter for arranging the investment "package" which included both the working interest and the drilling contract. If so, the Court stated that the premium should be allocated among the elements of the package in proportion to the fair market value of each element.

*Bernuth* is readily distinguishable from the instant case. First, in *Bernuth*, there was no issue as to whether the taxpayer had actually acquired a working interest. On the other hand, our primary concern, here, is whether petitioner ever owned the cattle that comprised the herd. Second, we do not doubt that petitioner knew that he had agreed to pay a purchase price in excess of the value of the cows. In *Bernuth*, it was not clear that the taxpayer knew he was paying an excessive price for the drilling contract; the Court also suggested that the excess could have been due to taxpayer's inexperience. Finally, as already discussed, the amounts that petitioner agreed to pay as maintenance and management fees far exceeded the reasonable cost of such services, and petitioner insists that such excess also constitutes a premium paid to the promoter for arranging the breeding program. Under these circumstances, any attempt to attribute the excessive payments that petitioner agreed to make under both the sales and management agreements to premiums paid to the promoters becomes untenable. In addition to a premium of as much as $30,000 allegedly included in the purchase price, petitioner expects us to find that approximately $36,000 of the scheduled maintenance and management fees constituted a premium. It is ludicrous to think that we would find that petitioner agreed to pay a premium of as much as $66,000 for assets worth, at most, $39,000.

would be quickly remedied by the ASA upgrading program. Clearly, the 1974 prices could be expected to decline steadily as the Simmental breed approached purebred status in North America, an objective that was realized by 1980.[17]

Indeed, the record does not show that the value of the herd ever exceeded the principal amount of the note. If anything, the record supports a conclusion quite to the contrary. By late 1974, one-half-Simmental-blood cows had a value in the range of $450 to $800 each. More importantly, in 1980 the herd was sold for $11,000, netting only $8,400 to $8,500 after brokerage fees, while the outstanding principal balance on the note was $22,000. Petitioner would have us overlook this fact because the herd was sold on the commercial cattle market and not the registered cattle market. Nevertheless, other than petitioner's own unsupported statements, there is no evidence whatsoever in the record to support a conclusion that the herd could have been sold for a significantly higher price on the registered cattle market. If so, certainly Mr. Judge would have attempted to sell the herd as registered cattle.[18]

The unreasonable discrepancy between the stated purchase price and the fair market value of the property presented in the instant case constitutes a critical factor in our determination that the transaction herein does not constitute a sale. A normal attribute of a true arm's-length sale is a purchase price at least approximately equal to the fair market value of the property. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1976); *Grodt & McKay Realty, Inc. v. Commissioner, supra.* See also *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. 670 F.2d 855 (9th Cir. 1982); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982). In *Estate of Franklin*, a partnership purportedly pur-

---

[17]In addition, we note that the projected value of the original four cows failed to even reflect any decline in their value over the 6-year term of the breeding program. Obviously, the cows would decline in value as they aged.

[18]During the course of his testimony, Mr. Judge stated that he sold the cattle as commercial rather than registered cattle because petitioner had not paid any management fees for 1½ years, he did not want to care for the cattle at his own expense any longer, and it would have taken too much time to sell the cattle as registered cattle. Nevertheless, we find it hard to believe that Mr. Judge would not have undertaken the added inconvenience if he could have sold the cattle for substantially more as registered cattle since he was entitled to retain the proceeds of the sale to the extent of the unpaid maintenance and management fees and the principal balance due on the note plus interest.

chased a motel for $1,224,000 and leased it back to the sellers. At the time of the sale, the partnership made a payment of $75,000 in prepaid interest, but none of the purchase price was paid at such time. The purchase price was to be paid in monthly installments over a 10-year period, with a large balloon payment due at the end of such period. Pursuant to the sale-leaseback, the monthly principal and interest payments that the partnership agreed to make were approximately equal to the seller's rental payments. The partnership's obligation to pay the purchase price was nonrecourse; it was only secured by the motel.

The Ninth Circuit had to determine whether the members of the partnership were entitled to deduct interest payments and depreciation with respect to the motel. The court held that the partners were not entitled to the deductions. In reaching its decision, the Ninth Circuit found that the taxpayers had failed to show that the purchase price of the motel—the principal amount of the nonrecourse indebtedness—was at least approximately equal to its fair market value. The court determined that this defect in the taxpayer's proof was fatal to their case, stating as follows:

An acquisition such as that of [taxpayers] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. * * * [544 F.2d at 1048.]

In the view of the court, an excessive purchase price and the resultant failure to acquire an equity in the property caused the transaction to lack the substance of a sale. Under these circumstances, the partnership did not make any investment in the property, the prerequisite to a depreciation deduction under section 167. In addition, the court found that the partnership did not incur a genuine indebtedness, as required for an interest expense deduction under section 163, because a purchaser does not acquire the use or forbearance of money

when a nonrecourse indebtedness unreasonably exceeds the value of the security therefor. In such a situation, the buyer has no economic incentive to actually pay the purchase price.

An examination of the objective facts shows that petitioner's investment in the breeding program was not designed to quickly yield an equity which he could not prudently abandon. Nevertheless, petitioner argues that the reasoning in *Estate of Franklin* is inapplicable to the instant case because he was personally liable for the purchase price. We cannot agree. In our view, petitioner's personal liability for the purchase price is illusory. On January 1, 1977, only 2½ years after the execution of the sales agreement, petitioner's alleged personal liability for the purchase price was scheduled to expire.[19] Petitioner maintains that this was done because the parties anticipated that the value of the herd would equal the purchase price by that time. Yet, even the unrealistic valuations set forth in the projection itself only estimated that the herd would be worth $33,000 at the end of the 3 years and not 2½ years.

On the basis of the facts before us, we think that petitioner's personal liability on the promissory note was never intended to secure the payment of the purchase price. Instead, it was used to insure that the promoters of the breeding program would receive a minimum payment through the amounts that petitioner agreed to pay as maintenance and management fees and interest prior to January 1, 1977. Pursuant to the agreements petitioner executed, his failure to pay either the interest or the maintenance and management fees would constitute a default under the sales agreement and promissory note. Certainly, it was not reasonable from an economic point of view for petitioner to pay the purchase price at the time he executed the sales agreement, but by paying the amounts denominated as interest and maintenance and management fees for 2½ years, he would avoid ever having to pay the $40,000 purchase price unless payment became economically reasonable. In addition, both the sales agreement and the promissory note provided that the purchase price was payable

---

[19]During the period of petitioner's alleged personal liability for the purchase price, FSF was required to replace any of the cows in the herd that died. Thus, petitioner confronted no real risk of loss during the entire period.

solely out of the net proceeds realized from the sale of the cattle. Since petitioner's successful automobile dealerships exhibit a degree of business acumen on his part, we find it unlikely that he would have incurred personal liability for a purchase price that he knew greatly exceeded the value of the four one-half-Simmental-blood cows. Under these circumstances, if we accepted petitioner's argument and found that he had acquired an equity in the cattle pursuant to an actual sale, we would be elevating form above substance by giving affect to the facade created by the promoters of the breeding program, something we refuse to do. Accordingly, we do not believe that petitioner ever made an actual investment in the cattle or incurred a genuine indebtedness to purchase the cattle.[20]

In addition, petitioner did not acquire any right to possess or exercise any real control over the herd. Under the management agreement, SMS had "full and absolute control of the location, maintenance, expansion, breeding and culling of the Herd." The only right that SMS did not possess is the right to sell the animals comprising the herd, other than culls. Although petitioner could have taken possession of the herd and terminated the management agreement upon full payment of the purchase price, such a right does not tend to support the conclusion that there was any sale when, at the inception of this transaction, the purchase price was far in excess of the value of the animals petitioner allegedly purchased. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1241–1242.

Moreover, since petitioner had no investment in the cattle, he did not directly bear the risk of loss with respect to the cattle. The only real risk that petitioner assumed with respect to his investment was the risk that the cattle would not appreciate as set forth in the projection, a risk that is a characteristic of an option as well as a sale. Indeed, we think that in reality FSF retained both the risk of loss with respect

---

[20]We do not believe that petitioner simply made a bad bargain. See *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir. 1976). Since the projection and both the sales and management agreements clearly indicate that the four cows were worth substantially less than the purchase price, petitioner must have known that the stated purchase price was excessive. On the record herein, we are thoroughly convinced that petitioner embarked upon this transaction with his eyes wide open.

to petitioner's herd and the benefits, if any, to be realized upon its disposition. Upon the disposition of the herd, FSF was entitled to retain the proceeds needed to satisfy the principal balance due on the note, and, at the time of the purported sale to petitioner, the ASA upgrading program made it very unlikely that the value of the herd would ever equal the purchase price. In fact, the record shows that the proceeds from the eventual sale of the herd did not even equal the reduced principal balance due on the note. Accordingly, FSF bore the risk that the herd would decrease in value and stood to benefit from any increase in value up to the principal balance of the note. Petitioner's only opportunity to profit from the sale of the herd was in the highly improbable event that the herd sold for a price in excess of $40,000. We do not consider this sufficient to support a finding that petitioner acquired the benefits of ownership. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1242–1243.

On the basis of the foregoing, we must conclude that petitioner's investment in the breeding program did not constitute a sale. We believe that the transaction was structured as a sale to enable the promoter to sell a package of artificial tax benefits. In substance, however, petitioner acquired no more than an option to purchase the herd for a price of $40,000.[21] See *Estate of Franklin v. Commissioner*, 64 T.C.

---

[21]During the course of the breeding program, petitioner made principal payments of $18,000. He made these payments from the amounts FSF had paid him for the 10 bull calves and the 2 three-quarter-Simmental-blood heifers. We, however, have accorded little significance to the principal payments in our analysis of the transaction herein partly because petitioner, himself, testified that the payments were motivated primarily, if not solely, by tax considerations. When petitioner executed the sales agreement, we do not believe that he contemplated making any principal payments prior to the final year of the breeding program, if ever. Indeed, we have found that the bull calf payments were intended to reduce the fees payable under the management agreement. Subsequently, however, petitioner's bookkeeper advised him to make the principal payments because of the newly enacted at-risk rules under sec. 465, effective for taxable years beginning after Dec. 31, 1975. Sec. 204(c), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1532, 1976–3 C.B. (Vol. 1) 8. At the end of 1976, immediately before his purported personal liability for the purchase price was to expire, petitioner made his first principal payment.

In addition, we found FSF's purchase of the two three-quarter-blood heifers for $4,000 each and the use of those proceeds to reduce the principal balance on the note highly questionable. The purchase price FSF paid for the two heifers simply reflected the values set forth in the projection. We have already found that the projected values were unrealistic, and it is highly unlikely that a three-quarter-Simmental heifer was worth $4,000 at the time of the alleged sales. In addition, petitioner testified that the two heifers were sold to FSF in order to obtain the funds needed to make the principal payments. Under such circum-

752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976).[22] On many prior occasions, the courts have disregarded for tax purposes complex artifices that are devoid of economic substance and are engaged in solely to acquire tax benefits. See, e.g., *Knetsch v. United States*, 364 U.S. 361 (1960); *Grodt & McKay Realty, Inc. v. Commissioner, supra*; *Derr v. Commissioner, supra*. The facade constructed by the promoters of the breeding program to support the tax consequences set forth in the projection is without economic reality and must be disregarded for tax purposes.

When petitioner's investment in the Simmental cattle-breeding program is viewed as the purchase of tax benefits and an option to acquire a breeding herd, his investment begins to make economic sense. We have already found that petitioner did not acquire actual ownership of the four cows purportedly sold to him. FSF and SMS, however, did agree to set aside the four cows and to develop a breeding herd therefrom. The fees set forth under the management agreement bear no relationship whatsoever to the cost of maintaining and managing the herd.[23] For 6 months during 1974, petitioner agreed to pay, and did in fact pay, SMS $10,000 labeled as maintenance and management fees. Such a label becomes meaningless in light of the fact the cost of maintaining and managing the cattle was no more than $1,200 for the period. In addition, the amounts that petitioner paid to FSF that were described as interest cannot be treated as such because petitioner never incurred a genuine indebtedness to purchase the cattle. Nevertheless, in exchange for the payments petitioner made to FSF and SMS, he acquired the right to purchase the four original cows and the herd developed therefrom for $40,000, a

---

stances, we are inclined to find that FSF's purchase of the two heifers and the use of the proceeds to reduce the balance due on the note was simply another fabrication used to support the package of tax benefits sold to petitioner. Essentially, petitioner acquired a reduction of $18,000 in the price at which he had the right to purchase the herd for a payment of only $10,000. At best, we think that this should be viewed as a modification of the terms of the original agreements undertaken to ensure the continued viability of the package of tax benefits purchased by petitioner.

[22]See also *Young v. Commissioner*, T.C. Memo. 1978–19.

[23]Even if the bull calf payments are viewed as offsetting a portion of the maintenance and management fees, the amount of such fees is still very excessive. The projection indicates that FSF would make bull calf payments (after taxes) of approximately $13,250, while the maintenance and management fees were excessive in an amount of over $30,000.

price that neither petitioner nor Mr. Judge expected to be paid unless the value of the herd appreciated substantially.[24] In addition, petitioner acquired a package of fabricated tax benefits that would, at a minimum, offset a significant portion of the cost of the investment. Moreover, if his income increased sufficiently, the tax benefits could net him a profit from the transaction regardless of whether he ever realized any gain from the option itself. In that event, the only risk of the transaction is that the package of tax benefits would not withstand the scrutiny of the Internal Revenue Service and the courts.

Since we think that petitioner attached some value to the right he acquired to purchase the herd, we are unwilling to characterize the entire transaction as a sham which must be wholly disregarded for tax purposes. Cf. *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1243–1244. Although petitioner undoubtedly wished to minimize the taxes on his rising income and found the tax benefits offered pursuant to the program extremely attractive, we believed petitioner when he testified that he was intrigued by the profits that the projection indicated could be realized upon the eventual sale of the herd. We are inclined to accept petitioner's testimony because it appears that his income in 1974 was too low for him to profit from the tax benefits alone. Petitioner did expect his income to rise, and it did, but it is not clear from the record that he expected his income to increase dramatically enough to allow him to reap a profit solely from the tax benefits. Furthermore, at the time petitioner entered the breeding program, the values set forth in the projection still reflected, to a degree, the current market prices for Simmental cattle.

For these reasons, we prefer to characterize petitioner's investment as an acquisition of fabricated tax benefits and an option to purchase a breeding herd. Nevertheless, we are convinced that petitioner realized that he was also purchasing

---

[24]Beginning on Jan. 1, 1979, SMS had absolute authority to sell the herd. If the value of the herd exceeded $40,000 at that point in time, petitioner would certainly exercise his right to purchase the herd rather than incur an additional liability of $24,000 under the management agreement. At any time after 1976, petitioner was free to abandon the transaction without any adverse consequences because his recourse liability expired as of Jan. 1, 1977. Indeed, the record indicates petitioner paid neither the maintenance and management fees for 1979 nor the principal balance owed on the note.

tax benefits and that most, if not all, of the payments he made to FSF and SMS were allocable thereto. Accordingly, since petitioner acquired no more than an option to purchase the breeding herd, he is not entitled to any of the deductions claimed in connection with the breeding program, and therefore, respondent's determination must be sustained.[25]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[25]Since petitioner has not established what portion of the payments he made to FSF and SMS is allocable to the right he had to purchase the herd, we need not decide whether petitioner is entitled to any deduction under sec. 1234 for the years in issue.