152 T.C. No. 5

UNITED STATES TAX COURT

BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MAINSTAY BUSINESS SOLUTIONS, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 16150-17L, 16189-17L.          Filed March 6, 2019.

In these consolidated cases P1 is a corporation of a federally
recognized Indian Tribe with a charter issued by the Department of
Interior (DOI) under sec. 17 of the Indian Reorganization Act (IRA
sec. 17). P2 is a division of P1. R initiated collection actions under
I.R.C. secs. 6320 and 6330 against P1 and P2 for unpaid employment
taxes generated from P2's business operations.

P1's charter allows it to create subdivisions for the purpose of
legally segregating the assets and liabilities of discrete business
endeavors. R argues that DOI does not have authority to grant P1 this
power because the grant is contrary to established State corporate law
principles. P1 argues that P2 is a legally separate division permitted
by P1's IRA sec. 17 charter and R is precluded from collecting P2's
employment tax liabilities from P1. As a secondary issue, R argues

that irrespective of the charter, P2 assumed P1's corporate identity and did not in fact operate as a separate division.

Held: P1's charter properly allowed it to create corporate divisions whose assets and liabilities were distinct from those of P1 for Federal tax purposes.

Held, further, P2 acted as a legally distinct division of P1; therefore, R is precluded from collecting P2's employment tax liabilities from P1.

Held, further, P2 is liable for employment taxes in accordance with the parties' concessions and stipulations.

Robert R. Rubin, Jonathan Edward Strouse, and Michael E. Chase, for petitioners.

Mark Alexander Ericson and Mark L. Hulse, for respondent.

GOEKE, Judge: In these consolidated collection due process (CDP) cases, petitioners seek review pursuant to section 6330, as made applicable by section 6320(c), of respondent's determinations set forth in his notices of determination.[1] Respondent initiated the collection actions with respect to unpaid employment taxes (i.e., Federal income tax, Social Security, and Medicare withholdings) for

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

several quarterly tax periods. Respondent sent petitioners Letters 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing under IRC 6320, on June 19, 2012, June 20, 2013, and December 19, 2013. On June 30, 2017, respondent sent petitioners three notices of determination sustaining the employment tax assessments in his notices of Federal tax lien filings. Respondent assessed unpaid employment taxes as follows:[2]

| Letter 3172 date | Tax period ended | Assessment balance |
|---|---|---|
| June 19, 2012 | June 30, 2009 | $264,906.27 |
| June 19, 2012 | Dec. 31, 2009 | 3,896,585.84 |
| June 19, 2012 | June 30, 2010 | 237,861.16 |
| June 19, 2012 | Sept. 30, 2010 | 431,504.25 |
| June 19, 2012 | Dec. 31, 2010 | 397,946.00 |
| June 19, 2012 | Mar. 31, 2011 | 4,131,635.19 |
| June 20, 2013 | June 30, 2011 | 1,085,074.37 |
| Dec. 19, 2013 | Sept. 30, 2009 | 1,085,347.21 |
| Total | | 11,530,860.29 |

---

[2]These assessment balances reflect the amounts recorded by respondent on his notices of Federal tax lien filing sent to petitioners. The amounts do not include interest and penalty accruals, abatements, payments, and the like, which occurred after the Federal tax liens were filed and recorded. Respondent has made concessions, and the parties have stipulated the current outstanding balances. Petitioners do not dispute the underlying employment tax assessments.

Following concessions and stipulations by the parties, the sole issue

remaining for decision is whether petitioner Blue Lake Rancheria Economic

Development Corp. (BLREDCo) is liable for the employment tax liabilities of its

corporate division, petitioner Mainstay Business Solutions (MBS).[3] We hold that

it is not.

---

[3]Petitioners initially challenged the computation of failure to deposit penalties assessed under sec. 6656 for some of the taxable quarters at issue. However, following concessions by respondent these penalties have been resolved in the fourth stipulation of facts as follows:

| Tax period ended | Penalty sec. 6656 |
|---|---|
| June 30, 2010 | $153,728.68 |
| Sept. 30, 2010 | 258,317.20 |
| Dec. 31, 2010 | 322,761.27 |
| Mar. 31, 2011 | 450,762.88 |

The fourth stipulation of facts also purports to resolve the penalties for the tax period ended March 31, 2010. However, as there was no notice of Federal tax lien concerning that period, we have no jurisdiction to consider it.

MBS has also filed a claim for interest abatement which is pending before the Court in docket No. 6510-18. The decision in this case does not take into account that separate pending claim.

FINDINGS OF FACT

The parties have filed four stipulations of facts which are incorporated herein by this reference. The petitions in these cases were timely filed on July 31, 2017. At that time BLREDCO's principal place of business was in California; MBS' principal place of business was also in California before it ceased operations.

Blue Lake Rancheria (Tribe) is an Indian Tribe federally recognized by the U.S. Department of the Interior (DOI). BLREDCo is a federally chartered corporation whose charter was issued to the Tribe by DOI. At all relevant times MBS operated a professional employment organization that provided employee leasing and temporary staffing services. MBS has its own Federal employer identification number (FEIN), separate from the one issued to BLREDCo. The employment taxes at issue arose from MBS' business operations.

On June 8, 2012, respondent prepared Forms 668(Y)(c), Notice of Federal Tax Lien, for the employment taxes for the tax periods ended June 30 and December 31, 2009, June 30, September 30, and December 31, 2010, and March 31, 2011 (first NFTLs). The first NFTLs were recorded with the County Recorders of Clark County, Nevada, and Sacramento County, California, and filed with the California secretary of state. The first NFTLs were recorded and filed in

the name of "MAINSTAY BUSINESS SOLUTIONS A DIVISION OF BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION" and "BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION DBA MAINSTAY BUSINESS SOLUTIONS." On June 19, 2012, respondent mailed Letters 3172 and copies of the prepared Forms 668(Y)(c) to MBS and BLREDCo. The Letters 3172 indicated that the first NFTLs were filed on June 19, 2012.

On June 10, 2013, respondent prepared Forms 668(Y)(c) for the employment taxes for the tax period ended June 30, 2011 (second NFTLs). The second NFTLs were recorded with the County Recorder of Clark County, Nevada, and filed with the California secretary of state. The second NFTLs were recorded and filed in the name of "BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION DBA MAINSTAY BUSINESS SOLUTIONS." On June 20, 2013, respondent mailed a Letter 3172 and copies of the prepared Forms 668(Y)(c) to BLREDCo. The Letter 3172 indicated that the second NFTLs were filed on June 21, 2013. Respondent has not issued a Letter 3172 or filed a notice of Federal tax lien in the name of MBS for the employment taxes for the tax period ended June 30, 2011.

On December 9, 2013, respondent prepared Form 668(Y)(c) for the employment taxes for the tax period ended September 30, 2009 (third NFTLs). The third NFTLs were recorded with the County Recorder of Clark County, Nevada, and filed with the California secretary of state. The third NFTLs were recorded and filed in the name of "MAINSTAY BUSINESS SOLUTIONS A DIVISION OF BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION" and "BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION DBA MAINSTAY BUSINESS SOLUTIONS." On December 19, 2013, respondent mailed Letters 3172 and copies of the prepared Forms 668(Y)(c) to MBS and BLREDCo. The Letters 3172 indicated that the third NFTLs were filed on December 19, 2013.

The first, second, and third NFTLs all reflected the FEIN of MBS, not that of BLREDCo.

On July 25, 2012, BLREDCo and MBS each timely filed a Form 12153, Request for a Collection Due Process or Equivalent Hearing, with respondent for the employment taxes for the tax periods listed in the first NFTLs. On July 18, 2013, BLREDCo and MBS each timely filed a Form 12153 with respondent for the employment taxes for the tax period listed in the second NFTLs. On January 15, 2014, BLREDCo and MBS each timely filed a Form 12153 with respondent

for the employment taxes for the tax period listed in the third NFTLs. The Forms 12153 filed by MBS and BLREDCo reflected different FEINs; the FEIN used by BLREDCo was not its own, but one of another related entity.

On June 30, 2017, respondent issued three notices of determination addressed to BLREDCo in relation to the first, second, and third NFTLs. The notices of determination included the FEIN of MBS.

I.      Creation of BLREDCo

In June 2003 the Tribe submitted a tribal resolution and proposed charter of incorporation to DOI, requesting approval of a Federal charter of incorporation under the Indian Reorganization Act of 1934 (IRA), ch. 576, sec. 17, 48 Stat. at 988 (codified as amended at 25 U.S.C. sec. 5124 (Supp. V 2017) (formerly codified at 25 U.S.C. sec. 477)) (IRA sec. 17). On December 29, 2004, DOI approved the Tribe's request and issued a charter under the authority of IRA sec. 17. On January 31, 2005, the Tribe's business council passed Resolution No. 05-07 ratifying the approved charter, which had the effect of bringing BLREDCo into existence as a federally chartered corporation (IRA sec. 17 corporation). In relevant part, BLREDCo's IRA sec. 17 charter states:

> WHEREAS, the Business Council has found that the formation of the
> Blue Lake Rancheria Economic Development Corporation pursuant
> to a § 17 Charter will serve the best interest of the Tribe, its members

and its enterprises and will protect the political integrity, economic security and health and welfare of the Tribe and its members by, among other things * * * creating a legal structure which provides for the segregation of discrete Corporation assets and liabilities into separate Corporate subdivisions, without divesting either the Corporation or the tribe of the privileges and immunities arising pursuant to their legal status under federal and Tribal Law * * *

* * * * * * *

**ARTICLE VIII. - Corporate Powers**
Subject to applicable federal law, the Corporation is authorized and empowered to exercise the following powers:

* * * * * * *

E. To create subdivisions of the Corporation for the purpose of legally segregating the assets and liabilities of discrete business endeavors of the Corporation regardless of common directorship; provided, that each such subdivision shall have the rights and privileges granted by and be subject to the limitations of this Charter.

II.     Creation of MBS

In 2003 MBS was formed as an enterprise of the Tribe and obtained a separate FEIN.  During all relevant times, MBS maintained its own separate FEIN. On December 11, 2006, the Tribe's business council passed Ordinance No. 06-02 (conversion ordinance), which created a new article in the Tribe's Tribal Code authorizing business entities wholly owned by the Tribe to convert to divisions of BLREDCo through a plan of conversion.  In relevant parts the conversion ordinance reads:

## § 2.1.3.01. Conversion of another business entity into a division of Blue Lake Rancheria Economic Development Corporation.

Any business entity wholly owned by the Tribe * * * may be converted into a division of the Blue Lake Rancheria Economic Development Corporation * * * as authorized by Article VIII, Section E of the Federal Charter issued on December 29, 2004 for * * * [BLREDCo] by the Secretary of the United States Department of Interior pursuant to 25 U.S.C. § 477.

\* \* \* \* \* \* \*

## § 2.1.3.04. Rights and liabilities.

(a) Except as set forth in subsection (c) below, an entity that converts into a division of * * * [BLREDCo] pursuant to this article is for all purposes the same entity that existed before the conversion.

(b) Upon a conversion taking effect, all of the following apply:

(1) All the rights and property, whether real, personal, or mixed, of the converting entity are vested in the converted division and shall be held separate and apart from all other rights and property of * * * [BLREDCo].

(2) All debts, liabilities, and obligations of the converting entity continue as debts, liabilities, and obligations of the division and shall be separate and apart from the debts, liabilities, and obligations of * * * [BLREDCo].

(3) All employees of the converting entity shall remain the employees of the * * * [BLREDCo] division.

(4) All authorization, identification numbers, and accounts held by the converting entity shall remain in full force and effect for the benefit of the new * * * [BLREDCo] division to the extent authorized or permitted by law.

(5) All rights of creditors and liens upon the property of the converting entity shall be preserved unimpaired and remain enforceable against the division to the same extent as against the converting entity as if the conversion had not occurred.

(6) Any action or proceeding pending by or against the converting entity may be continued against the division as if the conversion had not occurred.

(c) Except as expressly stated above, the division will operate as a division of * * * [BLREDCo] in accordance with the * * * [BLREDCo] Corporate Charter and the * * * [BLREDCo] Bylaws and the division shall have the status of a federally chartered corporation for all purposes.

Also on December 11, 2006, the Tribe's business council passed Resolution No. 06-29 (conversion resolution), which adopted a plan for converting MBS, in accordance with the conversion ordinance, from an enterprise of the Tribe to a division of BLREDCo. In coordination with the conversion resolution, a certificate of conversion was filed with the Tribal secretary. MBS' name was changed from "Mainstay Business Solutions" to "Mainstay Business Solutions, a division of Blue Lake Rancheria Economic Development Corporation." In relevant part the conversion resolution states:

> Upon Conversion, Mainstay Business Solutions, a division of * * * [BLREDCo], shall operate as a division of * * * [BLREDCo] under the direction and control of the * * * [BLREDCo] Board of Directors in accordance with the * * * [BLREDCo] corporate charter and bylaws, subject to § 2.1.3.04 of the Blue Lake Rancheria Tribal Code.

## III. Operations of BLREDCo and MBS

At all relevant times, MBS was engaged in a number of employment staffing business activities including employee leasing, temporary staffing, payroll services, and Human Resources administration outsourcing. Neither BLREDCo

nor any of its other divisions were engaged in similar business activities during the tax quarters at issue. In 2009 and 2010 MBS had more than 20,000 employees and more than $100 million in revenue and expenses.

MBS had its own bank accounts with Bank of America, including an operating account and a payroll account, and an account with Union Bank. MBS paid its employees from its Bank of America payroll account. MBS filed quarterly Forms 941, Employer's Quarterly Federal Tax Return, for employment tax quarters ended June 30, September 30, and December 31, 2009, March 31, June 30, September 30, and December 31, 2010, and March 31, 2011. MBS completed a Form 941 for the employment tax quarter ended June 30, 2011, but did not file the return with respondent. MBS had its own employee benefit plans including a section 401(k) retirement plan, health plan, dental plan, vision plan, and flexible benefits plan. MBS paid the employer's portions of the costs for the health, dental, and vision plans.

MBS had its own customers, including certain departments of the State of California, and used written contracts and client service agreements with those customers. MBS was paid by its customers; BLREDCo did not receive payments from MBS customers. MBS leased equipment and automobiles in its own name and made lease payments on the same. MBS had commercial general liability

insurance, workers compensation insurance, and property and casual insurance all in its own name. The premiums for these policies were all paid out of MBS' operating account.

BLREDCo was an entity that collected cash and assets for the Tribe for the purpose of economic development. BLREDCo had bank accounts and assets separate from MBS'. BLREDCo also administered a general fund with unrestricted cash from casino operations. The board of BLREDCo received informational updates on the operations of MBS at its board meetings but was not involved in the operations of MBS.

A.    MBS Office Space

MBS leased office space and paid the rent and personal property taxes associated with these leases. In addition, MBS occupied part of an office building at 605 Coolidge Drive, Folsom, California (Coolidge property). Title to the Coolidge property was taken in the name of BLREDCo d.b.a. MBS as required by Rabobank, the secured lender, in order to close the loan.

Although title to the Coolidge property was in the name of BLREDCo, MBS made the monthly mortgage payments on the building and paid maintenance and repair costs for the property. MBS also collected rent from a lessee in the building. In addition, MBS paid the property taxes, the utility bills, and the

liability insurance associated with the Coolidge property. The liability insurance named only MBS as insured.

B.     Flexible Funding Accounts Receivable Financing Agreement

On May 15, 2009, MBS and Flexible Funding, LLC (FF), entered into an accounts receivable financing agreement (FF agreement) whereby FF provided accounts receivable financing to MBS. The FF agreement was silent as to the relationship between BLREDCo and MBS. MBS, but not BLREDCo, gave FF a Form 8821, Tax Information Authorization, dated June 3, 2009. Under the FF agreement, certain MBS customers made payment, via check or wire transfer, to a joint bank account opened by MBS and FF for the benefit of FF. FF provided a line of credit against which MBS could draw.

On May 26, 2010, an amended financing agreement (amended FF agreement) was entered into between FF, BLREDCo, and MBS, which the agreement identifies as a division of BLREDCo. In relevant part the amended FF agreement states: "This agreement amends and restates in its entirety that certain Account Receivable Financing Agreement between MAINSTAY BUSINESS SOLUTIONS and FLEXIBLE FUNDING dated May 15, 2009 to reflect that Blue Lake Rancheria Economic Development Corporation was the original contracting party."

Although the amended FF agreement includes BLREDCo as a party and was ostensibly made to clarify that BLREDCo was a party to the original agreement, the terms of the amended FF agreement impose obligations and provide benefits to FF and MBS; they are completely silent as to BLREDCo.

The preamble to the amended FF agreement states:

FLEXIBLE FUNDING hereby agrees to provide MAINSTAY services as more fully set forth and specified in this Agreement. Such services shall include: (1) establishing and maintaining for MAINSTAY's benefit an "open end" credit program * * * using as collateral the assignment by MAINSTAY to FLEXIBLE FUNDING of all of the ACCOUNTS RECEIVABLE resulting from placement of temporary employees * * *.

In addition, the amended FF agreement, as it relates to collateral, provides:

12. MAINSTAY hereby agrees that all of its obligations under this Agreement are hereby secured by the assignment to FLEXIBLE FUNDING of the following property (hereinafter the "Collateral"):
   a. All accounts receivable, rights to receive payment for services rendered whether by contract or otherwise, rights to liquidated damages, claims for unliquidated debts (the "Accounts") now existing or hereafter created arising from any business of MAINSTAY * * *; and
   b. All proceeds from such Accounts * * *, and;
   c. All books and records relating to any of the above * * * in the possession or control of MAINSTAY * * *.
13. MAINSTAY agrees to execute, upon demand by FLEXIBLE FUNDING, any and all Financing Statements * * * useful or necessary to perfect FLEXIBLE FUNDING's security interest * * *. MAINSTAY hereby irrevocably appoints FLEXIBLE FUNDING its agent for the purposes of executing and filing any financing statement

or similar document which may be necessary to perfect and continue perfected such security interest under the Uniform Commercial Code.

The amended FF agreement is silent as to perfecting any interest against BLREDCo; however, attached to the agreement is a document entitled "ATTACHMENT PAGE TO FORM UCC-1" which lists BLREDCo as the "Entity's Name". On April 2, April 22, May 7, and June 11, 2010, FF filed UCC-1 Financing Statements which named BLREDCo as the debtor and MBS as an additional debtor. Each financing statement covered the collateral described in the amended FF agreement. Although BLREDCo was listed as the debtor on the financing statements, there is no evidence in the record that BLREDCo had any accounts or other assets that were covered by the collateral as described.

Following the amended FF agreement, MBS, not BLREDCo, continued to make payments to FF. In addition, as a condition of continuing the agreement, BLREDCo's board of directors granted a limited waiver of sovereign immunity in favor of FF, which was enforceable only against the assets of MBS. BLREDCo's IRA sec. 17 charter delegated to its board of directors the authority to waive sovereign immunity for the divisions of BLREDCo, including MBS.

### C.    MBS Ceases Operations

Economic conditions in the late 2000's and early 2010's made it difficult for MBS to meet its unemployment insurance obligations with the State of California. MBS failed to make several payments on its California unemployment insurance liability. MBS also failed to make appropriate payments to respondent for its employment tax liabilities throughout the periods at issue in these cases.

As a result of outstanding unemployment insurance liabilities, the California Employment Development Department (EDD) levied on the bank accounts and accounts receivable of MBS, making it impossible for MBS to pay its expenses, including payroll. MBS was forced to cease operations the same day the levies were served. In August 2011 EDD released the levies pursuant to a court order. EDD did not levy on the bank accounts of BLREDCo. MBS has few to no assets remaining following its cessation of operations. No MBS assets were transferred to the Tribe or BLREDCo during all relevant times, including after MBS ceased operations.

### IV.    IRA Sec. 17 Charters Generally

To establish an IRA sec. 17 corporation, an Indian Tribe must submit to the Secretary of DOI a resolution adopted by its tribal council requesting the issuance of a charter. The Secretary has delegated his power to issue corporate charters to

the Bureau of Indian Affairs (BIA) regional offices. As part of the approval process, each IRA sec. 17 charter must be reviewed by BIA for consistency with Federal law and subsequently approved by the BIA Regional Director and by the Assistant Secretary--Indian Affairs. Following approval by DOI, the tribal council must pass another resolution ratifying the charter. Upon passage of the ratifying resolution, the corporation is officially created. Once issued, an IRA sec. 17 charter cannot be revoked or surrendered except by an act of Congress.

IRA sec. 17 describes the powers that can be granted to an IRA sec. 17 corporation in its charter, and an IRA sec. 17 corporation is authorized to exercise only the powers specified in its charter. DOI has issued numerous IRA sec. 17 charters to Federal Indian Tribes. Since May 12, 1998, Federal charters have been issued to create at least 28 tribally owned corporations under IRA sec. 17, including the one issued to the Blue Lake Rancheria Tribe which established BLREDCo. Each of these 28 charters contained terms substantially similar to those found in BLREDCo's IRA sec. 17 charter allowing for the creation of corporate divisions for the purpose of legally segregating assets and liabilities.

## OPINION

We are a court of limited jurisdiction, and as such we must determine whether the case before us is one that Congress has authorized us to consider.

Naftel v. Commissioner, 85 T.C. 527, 529 (1985). These consolidated cases involve separate petitioners, and we must decide our jurisdiction over each. We have jurisdiction to decide a CDP case where there is a written notice embodying a determination by the Commissioner in regard to the filing of notices of Federal tax lien and the taxpayer timely files a petition with this Court. Secs. 6320(c), 6330(d); Lunsford v. Commissioner, 117 T.C. 159, 164 (2001). In these cases, respondent issued three notices of determination in relation to the notices of Federal tax lien, and petitioners timely filed petitions for this Court's review.

A notice of determination is generally valid if it specifies the taxable periods at issue, as well as the liabilities and collection action to which it relates or, at the very least, provides sufficient information so that the taxpayer cannot reasonably be deceived as to these items. Dees v. Commissioner, 148 T.C. 1 (2017); LG Kendrick, LLC v. Commissioner, 146 T.C. 17, 28-29 (2016), aff'd, 684 F. App'x 744 (10th Cir. 2017). We have held that a flaw in a jurisdictional notice is not fatal if the notice and any attachments are sufficient to apprise the taxpayer of the Commissioner's determination and the taxpayer was not prejudiced or misled by the flaw. LG Kendrick, LLC v. Commissioner, 146 T.C. at 29; John C. Hom & Assocs., Inc. v. Commissioner, 140 T.C. 210, 213 (2013) ("Mistakes in a notice will not invalidate it if there is no prejudice to the taxpayer.").

In First Rock Baptist Church Child Dev. Ctr. v. Commissioner, 148 T.C. 380, 387 (2017), we dismissed First Rock Baptist Church (Church) because it had not been issued a valid notice of determination. We determined we had jurisdiction over First Rock Baptist Church Child Development Center (Center), however, because the Center was the subject of the IRS collection action, the Federal tax lien arose against it, and the notice of determination was sent to the Center at its correct address, bore the Center's taxpayer ID number, and showed it related to the Center's quarterly tax periods at issue. Id. at 386-387. We dismissed the Church in that case because, although the notice had been erroneously addressed to it, the Church was not the subject of any IRS collection action, it had no outstanding tax liabilities, and no Federal tax lien had been filed against it. Id. at 387. Accordingly, we held that no valid notice of determination was issued by the IRS to the Church. Id. at 387-388.

In these cases, respondent issued a single set of three notices of determination relating to the notices of Federal tax lien he had previously issued to petitioners. Those notices of determination were addressed to BLREDCo; however, they included the unique FEIN of MBS. In addition, the notices made clear which tax periods and which liabilities and collection actions they related to. Petitioners were clearly not deceived as to the items covered by the notice of

deficiency, and each petitioner timely filed a petition with this Court. See Dees v. Commissioner, 148 T.C. at 9 (finding that the taxpayer "was not misled by the ambiguous notice of deficiency, as evidenced by the content of his timely filed petition").[4] Although separate notices of determination were not issued to MBS and BLREDCo, Federal tax liens were filed against both entities, both were sent Letters 3172 indicating the tax lien filings, both participated in the CDP Appeals process with respondent, and there is a dispute as to whether the tax liabilities can be collected from BLREDCo. Consequently, we find this situation distinguishable from that in First Rock Baptist Church Child Dev. Ctr. and determine our jurisdiction is appropriate as to MBS and BLREDCo.

The parties stipulate that petitioners had no opportunity before the CDP hearing to dispute the underlying tax liabilities at issue in these cases. Our jurisdiction allows us to review agency action embodied in a "determination". Secs. 6320(c), 6330(d)(1). Where a taxpayer had no prior opportunity to dispute the tax liability at issue, it may raise it for the first time in its hearing. Secs. 6320(c), 6330(c)(2)(B). Petitioners raised, in their hearing, a dispute as to who is

_____

[4]A notice of determination under secs. 6320 and 6330 is the jurisdictional equivalent of a notice of deficiency; therefore, our caselaw on valid notices of deficiency informs our analysis. See LG Kendrick, LLC v. Commissioner, 146 T.C. 17, 29-30 (2016), aff'd, 684 F. App'x 744 (10th Cir. 2017); Offiler v. Commissioner, 114 T.C. 492, 498 (2000).

liable for the underlying tax liabilities. There remains a genuine case or controversy between the parties as to who is liable for the taxes owed; and because the underlying tax liabilities are properly at issue, we will review respondent's determinations as to those liabilities de novo. See Sego v. Commissioner, 114 T.C. 604, 610 (2000).[5]

While the parties have stipulated the proper amounts of liabilities owed, they leave for us to decide who the responsible taxpayer is in these cases. Thus, we must review the appropriateness of respondent's collection action against each petitioner. MBS has conceded that respondent may collect from it the unpaid employment taxes; we must decide whether respondent can also pursue collection action against BLREDCo in these unique cases.

A few guiding principles can help to situate this dispute. As an initial matter, classification of organizations for Federal tax purposes is determined by

---

[5]Although neither party raised the issue, we must briefly consider our jurisdiction over MBS for the tax period listed in the second NFTLs. Respondent acknowledges that he never filed a Federal tax lien for the period ended June 30, 2011, in the name of MBS; however, our jurisdiction turns not on the filing of a Federal tax lien, but on the issuance of a notice of determination. First Rock Baptist Church Child Dev. Ctr. v. Commissioner, 148 T.C. 380, 388 (2017) (rejecting that "withdrawal of the NFTL by itself moots the entire case * * *. Section 6330(d)(1) grants us jurisdiction to review agency action that is embodied in a 'determination'"). Respondent has issued a notice of determination concerning the tax period ended June 30, 2011, and consequently that tax period is properly before us. See secs. 6320(c), 6330(d)(1).

Federal tax law. See sec. 301.7701-1(a)(1), Proced. & Admin. Regs. Whether an organization is an entity separate from its owners for Federal tax purposes is a matter of Federal tax law and does not depend on whether the organization is recognized as an entity under local law. Id. Relevant to this case, IRA sec. 17 corporations are not recognized as separate entities for Federal tax purposes. Id. subpara. (3). However, this is a dispute over employment taxes and, generally, even disregarded entities are treated as corporations for the purpose of employment taxes. Id. sec. 301.7701-2(c)(2)(iv). In other legal contexts a division of a corporate entity is not legally separate from the corporation. See, e.g., Breitman v. May Co. Cal., 37 F.3d 562, 564 (9th Cir. 1994) (for diversity of jurisdiction purposes, 28 U.S.C. sec. 1332, "the distinction between an incorporated subsidiary and an unincorporated division is important * * * . 'A division of a corporation does not possess the formal separateness * * * and thus is not an independent entity'" (quoting Schwartz v. Elec. Data Sys., Inc., 913 F.2d 279, 284 (6th Cir. 1990))); Stotter & Co. v. Amstar Corp. (In re Sugar Indus. Antitrust Litig.), 579 F.2d 13, 18 (3d Cir. 1978) (holding that for purposes of 15 U.S.C. sec. 15, "[a] division of a corporation is not a separate entity but is the corporation itself"). There must be something unique to this situation for us to divert from that customary understanding. Accordingly, to reach our holding we

must examine the creation of BLREDCo and the authority under which it seeks to be considered an entity separate and apart from MBS.

I.      IRA Sec. 17

The parties agree that DOI issued the Tribe an IRA sec. 17 charter establishing BLREDCo and that BLREDCo's charter contains language that purportedly allows it "[t]o create subdivisions of the Corporation for the purpose of legally segregating the assets and liabilities of discrete business endeavors of the Corporation regardless of common directorship".  Petitioners contend that the charter's text, approved by DOI, is controlling and precludes any responsibility of BLREDCo for the liabilities of MBS, including its employment tax liabilities. Respondent, however, counters that the charter exceeds the scope of IRA sec. 17 and cannot grant a corporation such a power; therefore, even though the BLREDCo charter purports to allow it to create divisions with legally segregated assets and liabilities, it may not properly do so.[6]

This is an issue of first impression for the Court.  In the only prior case where we have considered IRA sec. 17 we held, among other things, that a State-

---

[6]BLREDCo's IRA sec. 17 charter granted it the power to create subdivisions to legally segregate the assets and liabilities of its discrete business endeavors; however, the conversion ordinance refers to the converting entity as a division. We find these terms interchangeable, but for the sake of clarity we attempt to refer to MBS as a division throughout this report.

chartered corporation of an Indian Tribe is subject to Federal income tax even though an IRA sec. 17 corporation is not. Uniband, Inc. v. Commissioner, 140 T.C. 230, 264 (2013). Although that case does not address the issues we are considering today, we note that in Uniband we observed that DOI's issuance of charters was within its discretion as afforded by IRA sec. 17; an Indian Tribe has the option only to adopt or veto an issued charter as that charter confers only the powers DOI is willing for the tribal corporation to possess. Id. at 261-262.

A.   Statutory Interpretation

This dispute is primarily one of statutory interpretation. As we typically do when looking at such issues, we must first examine the text of the statute. The Supreme Court has said that "in any case of statutory construction, our analysis begins with the language of the statute * * * . And where the statutory language provides a clear answer, it ends there as well." Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 254 (2000) (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999)); United States v. Mo. Pac. R. Co., 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."). Moreover, where the statute is clear on its face, unequivocal evidence of

legislative purpose is required before we can construe the statute to override the plain meaning. Halpern v. Commissioner, 96 T.C. 895, 899 (1991).

Unique to this case, we are also mindful that the Supreme Court has cautioned that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985). Rather, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit". Id. This principle of statutory construction must guide our analysis of IRA sec. 17.

In 1934 Congress enacted IRA, including IRA sec. 17, in order "[t]o conserve and develop Indian lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes." IRA, 48 Stat. at 984. Except for minor amendments not relevant here, see Act of May 24, 1990, Pub. L. No. 101-301, sec. 3(c), 104 Stat. at 207, the text of IRA sec. 17 has remained largely unchanged and in its entirety reads:

> The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe: Provided, That such charter shall not become operative until ratified by the governing body of such tribe. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold,

manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law; but no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

Respondent submits that IRA sec. 17 corporations cannot have the power to create legally distinct divisions whose liabilities are uncollectible from the corporation--a power, respondent argues, other corporations do not have. Petitioners counter that the wording is broad and by its express terms does not prevent IRA sec. 17 corporations from holding this power. For the reasons that follow, we are unpersuaded by respondent's reading of IRA sec. 17.

B.     Application of State Law

Central to respondent's argument is his belief that State law should guide our interpretation of IRA sec. 17. Respondent encourages us to consider that IRA sec. 17 allows tribal corporations to be vested with powers "incidental to the conduct of corporate business, not inconsistent with law", which respondent maintains must be limited to State law corporate powers.

BLREDCo is a tribal corporation created by a Federal charter, issued by a Federal agency under IRA sec. 17--a Federal law--involved in a dispute over

Federal taxes. We fail to see why respondent believes State law should apply. It is a common principle of statutory interpretation that where Congress has shown it knows how to express a limitation, we will not assume it has done so through silence, absent a clear expression of intent. See Miss. ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 169 (2014) (interpreting the Class Action Fairness Act of 2005, the Court reasoned that "[h]ad Congress intended" a statutory numerosity requirement to mean named or unnamed parties "it easily could have drafted language to that effect. Indeed, when Congress wanted a numerosity requirement in CAFA to be satisfied by counting unnamed parties in interest in addition to named plaintiffs, it explicitly said so"); see also Meghrig v. KFC Western, Inc., 516 U.S. 479, 485 (1996) ("Congress * * * demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and * * * the language used to define the remedies under RCRA does not provide that remedy."). Had Congress intended for IRA sec. 17 to be limited by State law, it knew how to do so explicitly. In fact, it did so in other sections of IRA. For example, IRA sec. 4, 48 Stat. at 985 (amended by the Indian Land Probate Reform Technical Corrections Act of 2005, Pub. L. No. 109-157, sec. 8(b), 119 Stat. at 2952) (codified as amended at 25 U.S.C. 5107 (Supp. V 2017)) (emphasis added), provided that restricted Indian lands "shall descend or be devised, in accordance

with the then existing <u>laws of the State</u>, or Federal laws where applicable, in which said lands are located". In IRA sec. 17, Congress chose not to explicitly call for the application of State law to incorporated tribes. Therefore, absent a clear showing to the contrary in the legislative history, we will not assume Congress intended a tribal corporation chartered under IRA sec. 17 to be limited by State law.[7]

Respondent's reading has another problem. The Constitution provides that "the Laws of the United States * * * shall be the supreme Law of the Land". U.S. Const. art. VI, cl. 2. Therefore, we will not assume that Congress chose to subordinate its authority to State law, absent a clear showing of congressional

---

[7]History surrounding the enactment of IRA further illustrates congressional awareness in applying State law. <u>United States v. Riverside Bayview Homes, Inc.</u>, 474 U.S. 121, 136-137 (1985); <u>United States v. Universal C.I.T. Credit Corp.</u>, 344 U.S. 218, 222 (1952) ("[R]egard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning."). A prior Senate version of IRA allowed restricted land to "descend or be devised, in accordance with existing law". S. 3645, 73d Cong., sec. 4 (2d Sess. 1934). Contrast that with a prior House version, which provided that restricted land "may descend or be devised in accordance with the then existing laws of the State in which said lands are located". H.R. Rept. No. 73-1804, at 2 (1934) (accompanying H.R. 7902). As finally enacted, the House version was adopted with an additional caveat that "Federal laws where applicable" also apply. H.R. Rept. No. 73-2049, at 2, 7 (1934) (accompanying S. 3645); 78 Cong. Rec. 12162-12163 (1934) (statement by the house conferees explaining that section 4 of the conference version "is section 4 of the House bill" with some amendments).

intent. Moreover, even in the absence of express legislative preemption, we may infer that Congress intended to foreclose the application of State law where an "Act of Congress * * * touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). Said another way, "Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988).

We recognize that the Constitution confers authority on Congress to regulate Indian affairs, see U.S. Const. art. I, sec. 8, cl. 3 ("Congress shall have power * * * To regulate Commerce * * * with the Indian Tribes[.]"), and this authority has been described by the Supreme Court as "plenary" and "exclusive", South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs[.]"); County of Oneida, N.Y. v. Oneida Indian Nation, 470 U.S. 226, 234 (1985) ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law."); see also Am. Vantage Cos. v. Table Mt. Rancheria, 292 F.3d 1091, 1096 (9th Cir. 2002) ("Because 'Congress possesses plenary power over Indian affairs,' * * * Indian tribes fall under nearly exclusive federal, rather than state, control.").

"[T]ribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 154 (1980). Thus, Congress has evidenced an intent to dominate the field of Indian law so that it generally preempts State law on the subject. Absent clear intent to the contrary, we will not assume Congress intended to lessen its preemption in this field by allowing State law to control what powers may be held by an IRA sec. 17 corporation.

We find no clear intent in the text of IRA sec. 17 that tribal corporate powers should be limited by State law. Respondent points us to the phrase "not inconsistent with law" as evidence that State law applies. However, clearly, in the light of the principles outlined above, that phrase does not suggest the application of State law. Likewise, we find no clear intent in the legislative history of IRA sec. 17 suggesting it is to be limited by State law principles.

Throughout the voluminous legislative history relating to the enactment of IRA and, specifically, IRA sec. 17, respondent has identified only two statements from a single member of Congress to support his reading. Isolated statements of a single member of Congress, especially one absent from the relevant committees and lacking a leadership role in the bill's passage, are "not impressive legislative history". Zuber v. Allen, 396 U.S. 168, 187 (1969); see also Garcia v. United

States, 469 U.S. 70, 76 (1984) ("We have eschewed reliance on the passing comments of one Member * * * and casual statements from the floor debates."). Even so, we are not sure these statements provide as much support as respondent would have us conclude.

During debate on the House version of IRA, before the conference committee report, Representative Hastings--who did not sit on the relevant House committee and who had no leadership role related to the bill--discussed four sections of the bill, three of which were never enacted. See 78 Cong. Rec. 11739 (1934); see also Statement by House conferees, 78 Cong. Rec. 12163-12164 (1934) (explaining which provisions were adopted in the conference report and noting the exclusion of three sections discussed by Rep. Hastings). See generally H.R. Rept. No. 73-2049 (1934) (conference report to accompany S. 3645). In his floor speech, he stated his support for authorizing the formation of Indian chartered corporations to promote the economic welfare of the Indian Tribe, so long as "it is made clear that they are governed by the State and Federal laws". 78 Cong. Rec. 11739 (1934). He also expressed some discomfort with the self-government features of certain sections in the House bill. In particular, he noted: "I think every tribe, wherever located, should be * * * subject to State and Federal laws and courts." Id. Clearly, these casual statements are nothing more than

passing comments on Representative Hastings' preference that Indian Tribes as a whole ought to be governed by State law in addition to Federal law. Regardless of his views on the matter, the reality is that they are not. This is evident in his comments on the subject; if Indian Tribes were already subject to State law, he would have no need to express his views that they "should be" subject to the same. Representative Hastings' personal views are not relevant to interpreting the statute at issue here, and we give no weight or consideration to his statements concerning sections of the bill that were never enacted. Shannon v. United States, 512 U.S. 573, 583-584 (1994) ("To give effect to this snippet of legislative history, we would have to abandon altogether the text of the statute as a guide in the interpretative process. * * * '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" (quoting Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 712 (1987)).

We would expect a clear statement of congressional intent before assuming a desire to disrupt the well-settled notion of federalism and the principles of preemption and Federal law supremacy. Finding no clear statement to that effect in the text or the legislative history, we are persuaded that Congress did not intend

IRA sec. 17 corporations to be limited by State law.[8]  Respondent has not argued that the power DOI has conferred on the Tribe to create legally separate subdivisions is inconsistent with Federal law, and we can find no reason why it would be.

C.     Powers Incidental to the Conduct of Corporate Business

Having determined that State law does not restrict the powers of tribal corporations chartered under IRA sec. 17, we must turn to respondent's other argument.  Respondent urges us to find that the power to create legally distinct corporate divisions is not an ordinary corporate power--i.e., it is not one possessed by corporations organized under State law (State corporations).  Thus, he argues, it is outside the scope of IRA sec. 17 for DOI to grant a charter containing such a power.  We must attempt to discern whether the power to create legally separate corporate divisions is one within the plain meaning of IRA sec. 17.  Where the statute is clear, we must interpret the law as written and are not free to replace the

_____

[8]Our holding is also consistent with DOI regulations.  In 2004 when the Tribe's charter was approved, DOI regulations imposed no restrictions on the type of corporate powers that could be granted to IRA sec. 17 corporations.  See generally 25 C.F.R. pts. 81, 82 (2004).  Pts. 81 and 82 were combined into pt. 81 and pt. 82 was removed in 2015.  Final Rule, 80 Fed. Reg. 63094 (Oct. 19, 2015).  Additionally, current regulations only instruct the BIA to review proposed IRA sec. 17 charters for violations of Federal law.  25 C.F.R. 81.45(c)(3) (2018).

text with "unenacted legislative intent." INS v. Cardoza-Fonseca, 480 U.S. 421, 453 (1987) (Scalia, J., concurring).

On its face, IRA sec. 17 is plainly intended to be broad. It expressly sets out what Federal charters issued by DOI "may convey to the incorporated tribe". This permissive provision implies discretion. See Lopez v. Davis, 531 U.S. 230, 241 (2001) ("[U]se of the permissive 'may' * * * contrasts with the legislators' use of a mandatory 'shall' in the very same section. Elsewhere * * *, Congress used 'shall' to impose discretionless obligations[.]"). IRA sec. 17 does not specify an exhaustive list of the powers that DOI can convey to an IRA sec. 17 corporation; rather it frames the kinds of powers that DOI may grant through the issuance of a Federal charter. IRA sec. 17 contains no explicit grant of authority for a DOI issued charter to allow a corporation to create subdivisions with legally distinct assets and liabilities. However, it is clear from the brevity of IRA sec. 17 that the statute is not intended to serve as a comprehensive list of powers DOI may properly grant through an IRA sec. 17 charter. In fact, only two powers are expressly mentioned in the text of the statute: "the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property" and "the power to purchase restricted Indian lands".

IRA sec. 17 also places very few limitations on the broad power it otherwise grants DOI to issue Federal charters to Indian Tribes. In particular, it expressly disallows the granting of charters that would permit corporations "to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation." The only other restriction in the statute is the general provision that grants cannot be "inconsistent with law", which we have already held to mean Federal law. Rather than search the express list of powers in IRA sec. 17 for the authority to create legally distinct divisions of an IRA sec. 17 corporation, petitioners contend that such a power is derived from the broad authority of DOI to grant charters that convey "further powers as may be incidental to the conduct of corporate business".

Respondent's central argument throughout these proceedings is that a tribe incorporated under IRA sec. 17 cannot have powers that a corporation incorporated under State law would not have. Respondent's position is summarized in his reply brief: "Clearly, a power that non-section 17 corporations do not possess cannot be incidental to the conduct of corporate business." We have already explained why we do not believe that IRA sec. 17 corporate powers should be limited to those of State corporations. We must assume that absent "a plain indication to the contrary, * * * Congress when it enacts a statute is not

making the application of the federal act dependent on state law." <u>Miss. Band of Choctaw Indians v. Holyfield</u>, 490 U.S. 30, 43 (1989) (citations omitted).[9]

The canon of statutory construction unique to Indian law also weighs against respondent on this point. We are mindful that canons are "only guidelines, not substantive laws, and should not be used to defeat the manifest intent of Congress." <u>United States v. Atl. Richfield Co.</u>, 612 F.2d 1132, 1139 (9th Cir. 1980). However, the Supreme Court has guided us to construe statutes liberally in favor of Indians. <u>Blackfeet Tribe of Indians</u>, 471 U.S. at 766. Congress willingly ceded broad authority to DOI and vested it with the sole discretion as to what powers may authorized for IRA sec. 17 corporations. See <u>Uniband v. Commissioner</u>, 140 T.C. at 261-262. Moreover, while we are not "free to create favorable rules" based on this principle of statutory construction, <u>Fry v. United States</u>, 557 F.2d 646, 649 (9th Cir. 1977), IRA sec. 17 can be liberally construed to give DOI broad power to issue charters to Indian Tribes without creating a favorable rule unsupported by the statutory text.

--------

[9]This statement is also consistent with our reading of IRA sec. 17 in <u>Uniband</u> where we explained the distinctions between a State-chartered corporation and an IRA sec. 17 corporation that led us to hold that State-chartered corporations are subject to Federal income tax where IRA sec. 17 corporations are not. <u>Uniband, Inc. v. Commissioner</u>, 140 T.C. at 264 ("In sum, * * * [the State-chartered corporation] lacks the special character of a section 17 corporation and its special relationship to an Indian tribe.").

Although IRA sec. 17 corporations may be vested with broad powers, including ones not available to State corporations, we must still determine whether the power to create legally distinct subdivisions is one "incidental" to conducting corporate business. Petitioners suggest that we should look at how courts have interpreted the word "incidental" in the National Bank Act of 1864 (National Bank Act) to guide our understanding of the word as it is used in IRA sec. 17. In Bank of Am. v. City & Cty. of S.F., 309 F.3d 551, 562 (9th Cir. 2002) (quoting M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 F.2d 1377, 1382 (9th Cir. 1977)), the Court of Appeals for the Ninth Circuit held that as used in the National Bank Act "[i]ncidental powers include activities that are 'convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act.'" However, absent clear intent that Congress intended the meaning in both statutes to be the same, we will not apply this same reading here. Nothing in IRA suggests to us that Congress intended the use of the word "incidental" in IRA sec. 17 to have the same meaning as the "incidental powers" phrase in the National Bank Act. Instead, we will rely on the plain meaning of this provision within the context of IRA sec. 17.

In the absence of a statutory definition, "we construe a statutory term in accordance with its ordinary or natural meaning." FDIC v. Meyer, 510 U.S. 471, 476 (1994). Courts frequently turn to dictionaries to determine a word's ordinary meaning. See id.; see also, e.g., Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995); Commissioner v. Soliman, 506 U.S. 168, 174 (1993). At the time IRA sec. 17 was enacted, "incidental" was defined as "happening as a chance or undesigned feature of something else; casual; hence, not of prime concern; subordinate; collateral". Webster's New International Dictionary of the English Language 1088 (1930). It was likewise defined by Oxford as "occurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part; casual." Oxford New English Dictionary on Historical Principles Volume V2 152-153 (1901). Consistent throughout these definitions is the theme that "incidental" denotes a nonessential, casual, or subordinate part of a larger scheme.

In 1933, a year before the enactment of IRA sec. 17, Black's Law Dictionary 943 (3d ed. 1933) stated:

> The term "incidental powers," within the rule that a corporation possesses only those powers which its charter confers upon it, either expressly or as incidental to its existence, means such powers as are directly and immediately appropriate to the execution of the powers

expressly granted and exist only to enable the corporation to carry out the purpose of its creation. * * *

In the light of these definitions, we understand incidental powers to include ones that are nonessential and subordinate, but nevertheless appropriate to the powers expressly granted in the corporation's charter. Further, these powers must exist only to aid the corporation, even if only casually, in carrying out the purpose for which it was created.

Applying this meaning to the instant cases, powers incidental to an IRA sec. 17 corporation are powers, even nonessential ones, which are appropriate to the execution of the powers expressly stated in the corporation's charter and aid the corporation in carrying out the express purpose for which it was created. This encompasses a broad array of corporate powers. Certainly, as BLREDCo argues, the creation of legally distinct subdivisions whose assets and liabilities are not collectible from the corporation as a whole has a role in furthering the purpose of BLREDCo--i.e., to promote the economic stability of the Tribe. In fact, BLREDCo's charter explicitly provides that such power is essential to protecting the "economic security" of the Tribe and furthering the purpose of BLREDCo.

Given the plain meaning of the word "incidental", we understand the phrase "powers incidental to the conduct of corporate business" to encompass powers

subordinate and nonessential to the corporation's overall business and which are appropriate to the execution of other powers specifically granted to an IRA sec. 17 corporation through its charter and aid the IRA sec. 17 corporation in carrying out its expressly stated purpose. In these cases, the power at issue is one the Tribe has expressly described in its Federal charter as essential to the corporation's purpose. Even if it were not essential, however, we believe it clearly aids BLREDCo in carrying out its explicit purpose and is therefore incidental to the execution of other powers expressed in BLREDCo's IRA sec. 17 charter.

We believe the plain meaning of powers "incidental to the conduct of corporate business" allows for broad discretion in the powers granted to an IRA sec. 17 corporation through its charter. Nothing in the legislative history suggests to us that Congress intended a different result. Thus, we find that it is within the scope of IRA sec. 17 to grant tribal corporations incorporated under its provisions the power to create legally distinct subdivisions.

D. Subsequent Agency Interpretation

Given the plain meaning of the relevant statutory text, informed by the legislative history, the power DOI granted to BLREDCo--to establish legally distinct subdivisions of the corporation--is one encompassed within the phrase "powers as may be incidental to the conduct of corporate business, not

inconsistent with law". A brief overview of the subsequent interpretation of IRA sec. 17 by DOI confirms our reading.

Under IRA sec. 17, DOI is tasked with issuing charters to Federal Indian Tribes. DOI has issued several charters with terms substantially similar to the terms found in BLREDCo's charter, allowing tribal corporations to create subdivisions whose liabilities and assets are legally distinct from those of the rest of the corporation. In fact, the record reflects that DOI has issued at least 27 charters with such terms, other than the one issued to BLREDCo. Clearly, DOI's prevalent issuance of such charters indicates a belief that it is empowered by IRA sec. 17 to grant such a power to Indian Tribes.

In addition DOI has issued three Solicitor Opinions on IRA sec. 17. The DOI Solicitor, appointed by the President and confirmed by the Senate, is responsible for performing the legal work of DOI. Act of June 26, 1946, ch. 494, 60 Stat. 312 (codified as amended at 43 U.S.C. 1455 (Supp. II 2014)). As part of his responsibilities, the Solicitor has the authority "[t]o issue final legal interpretations, in the form of M-Opinions * * *, on all matters within the jurisdiction of the Department". DOI Departmental Manual, 209 DM 3.2(A)(11). Solicitor Opinions are "binding, when signed, on all other Departmental offices and officials and * * * may be overruled or modified only by the Solicitor, the

Deputy Secretary, or the Secretary." Id. Of course, these opinions are not binding on us, but we find them persuasive insight into how DOI interprets the statutes it is tasked with executing.

While none of the opinions issued by the Solicitor directly deal with the power DOI conferred on BLREDCo in these cases, they do describe DOI's views of IRA sec. 17 generally. The first of these opinions, issued May 15, 1934, before the enactment of IRA, discussed the constitutional authority of the Congress to incorporate an Indian Tribe. Solicitor's Opinion, Indian Corporations--Federal Charters (May 15, 1934). In finding that "there is no constitutional restriction upon the method of incorporation that Congress may select", the Solicitor explained that the legislation under consideration "puts the responsibility for working out * * * [administrative] details upon the Secretary of the Interior and the Indians seeking the charter." Id.

Following enactment of the IRA, the Solicitor issued two more opinions on IRA sec. 17. In an opinion discussing whether an IRA sec. 17 charter could permit an Indian Tribe to ignore statutory requirements related to making a contract, the Solicitor noted: "It seems to be clear from this language that section 17 permits the Secretary to grant to incorporated tribes far-reaching powers with respect to the conduct of business activities". Solicitor's Opinion M-36119,

Contracts for the Employment of Managers of Indian Tribal Enterprises (Feb. 14, 1952). The Solicitor went on to explain that the Secretary's power is subject only to the express limitations of IRA sec. 17: The Secretary may not authorize a tribal corporation to sell reservation land or lease the same for a period of more than 10 years, and the Secretary may not authorize incidental corporate powers that are inconsistent with law. Id. These are the same express limitations we have identified in the statutory text. Further, the Solicitor explained that powers inconsistent with law are ones "which cannot lawfully be given to any corporation". Id. Clearly, the power at issue in these cases is one that could be given to State corporations; respondent's argument is simply that it has not been, and therefore, he claims, it cannot be given to IRA sec. 17 corporations. In 1958 the Solicitor restated and reaffirmed his position from the 1952 opinion. See Solicitor's Opinion M-36515, Separability of Tribal Organizations Organized Under Sections 16 and 17 of the Indian Reorganization Act (Nov. 20, 1958).

Although these opinions are not binding authority on us, they are helpful in confirming our understanding of the broad authority DOI has under IRA sec. 17.

E.    Conclusion

The plain terms of IRA sec. 17 clearly bestow broad discretionary power on DOI to issue Federal charters of incorporation to Indian Tribes. The powers that

may be conferred on a tribal corporation under IRA sec. 17 are not limited to those held by State corporations, nor are they limited by State law. Consequently, the power granted to BLREDCo "[t]o create subdivisions of the Corporation for the purpose of legally segregating the assets and liabilities of discrete business endeavors of the Corporation regardless of common directorship" is within the scope of IRA sec. 17.

## II.    Operations of BLREDCo and MBS

Respondent framed his argument primarily as a legal one, contending that the issue in these cases is whether an IRA sec. 17 charter can allow BLREDCo to create subdivisions whose assets and liabilities would be legally distinct from those of the corporation. However, respondent also suggested at trial and in his brief that even if such a power was within the scope of IRA sec. 17, as we have determined it is, MBS was not in fact a legally distinct division of BLREDCo and thus cannot count on the benefit of having its liabilities segregated from those of the corporation. Although neither party devoted much attention to this issue--a combined six pages of briefing--we are compelled to examine respondent's concern and address whether MBS was in fact operated as a legally distinct division of BLREDCo.

Respondent appears to have conceded this issue in his reply brief. He acknowledges that MBS was engaged in a "separate and distinct business that generated the tax liability at issue * * * [and] was always operating this business endeavor as a division of BLREDCo." Nonetheless, he points out that "when it was to their benefit, petitioners had no problem with operating as BLREDCo dba MBS". Respondent points to two instances where he claims MBS assumed the identity of BLREDCo to receive some benefit. His argument seems to be that this should prevent MBS from now claiming the benefit of having liabilities legally segregated from those of BLREDCo. We will examine respondent's claims.

Respondent first points to the Coolidge Property as evidence that MBS was willing to assume the identity of BLREDCo when doing so was to its benefit. Although the Coolidge Property was acquired in the name of BLREDCo d.b.a. MBS, MBS still assumed all benefits and burdens of ownership of the property including making the monthly mortgage payment, maintaining liability insurance, paying the utility bills, paying the property taxes, and collecting rent from a sublessee. The record is not entirely clear as to why title was taken in the name of BLREDCo. However, Eric Ramos, the CEO of MBS, testified that it was in part because some banks have trouble understanding what a division of an IRA sec. 17 corporation is and are wary about entering a financing arrangement with such an

entity. Some banks may also be concerned about the ability of an IRA sec. 17 corporation to take title to property.

Regardless of whose name title was taken in, we determine ownership for Federal tax purposes on the basis of who possesses the benefits and burdens of ownership, rather than legal title. See Houchins v. Commissioner, 79 T.C. 570, 591 (1982); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). We believe this analysis can be extrapolated to the facts at hand, and on the record before us it is clear that the benefits and burdens of ownership were felt by MBS. See Houchins v. Commissioner, 79 T.C. at 591 ("The question of whether the benefits and burdens of ownership have been transferred is essentially one of fact * * *. Among the factors to be considered in making this determination are:" who holds title, who has control over the property and the extent of such control, who bears the risk of loss or damage to the property, and who receives the benefits from the property). Therefore, MBS was the owner in fact of the Coolidge Property, and the issue raised by respondent is of little consequence. Moreover, even assuming MBS took on the identity of BLREDCo for the purpose of purchasing the Coolidge Property, we are not inclined to use this isolated instance to impute all assets and liabilities of MBS to BLREDCo in

contravention of the intended business structure as allowed by BLREDCo's IRA sec. 17 charter.

Next, respondent suggests that because MBS entered into a financing agreement for its accounts receivable as BLREDCo, petitioners should be foreclosed from now arguing MBS was a legally distinct division of BLREDCo. MBS initially entered into the FF agreement as itself; that agreement did not mention BLREDCo at all. A year later MBS entered into the amended FF agreement, which provided that "Blue Lake Rancheria Economic Development Corporation was the original contracting party." In spite of this, following the enactment of the amended FF agreement, MBS continued to make payments to FF, not BLREDCo. In addition, there is nothing in the record indicating the BLREDCo had any accounts or other assets that could actually be foreclosed on by FF under their filed financing statements in the event of default.[10] Rather than the explanation respondent encourages, the more likely explanation for this

---

[10]It is also not clear from the record whether FF was authorized to file UCC financing statements naming BLREDCo as the debtor. Authorization must be provided by the debtor for a financing statement to be valid. Cal. Com. Code sec. 9509 (West 2010). Although the amended FF agreement named BLREDCo as a contracting party, the section on collateral authorized FF to file financing statements only against accounts held by MBS.

arrangement seems to be that FF was hesitant to enter into an agreement with MBS, an entity they did not fully comprehend.

This explanation is bolstered by the fact that FF requested a limited waiver of sovereign immunity as a condition of continuing the arrangement. BLREDCo consented and passed a resolution calling for a limited waiver of sovereign immunity in favor of FF (waiver resolution); importantly, however, the waiver resolution was limited to the assets of MBS. Respondent urges that the waiver resolution bolsters his argument that MBS and BLREDCo were acting as one and the same because BLREDCo asserted that it was "operating as MBS" when the agreements with FF were signed. We believe, however, contrary to respondent's assertion, that this waiver does nothing to support his position. Respondent's argument disintegrates when we take into account that BLREDCo was the only entity permitted under the IRA sec. 17 charter to waive sovereign immunity. Rather than an admission that MBS and BLREDCo were one and the same, the waiver resolution merely states the obvious. BLREDCo had to be operating as MBS in order to waive sovereign immunity as requested by FF. See Uniband, Inc. v. Commissioner, 140 T.C. at 261 ("One feature of a section 17 corporation is that it gives a tribe the ability to waive tribal sovereign immunity for a business operated by a section 17 corporation[.]"). Even assuming MBS presented itself as

BLREDCo in its dealings with FF, as respondent urges, we do not find this instance enough to justify piercing the entirety of BLREDCo and MBS' chosen relationship as permitted by the DOI-authorized charter.

Perhaps most important in these cases is what respondent does not argue or dispute. For instance, there is no indication in the record that respondent was misled as to who owed the employment taxes at issue in these cases. MBS, using its unique FEIN, filed the quarterly employment tax returns for the periods at issue. Even so, respondent attempts to confuse the issue by suggesting that MBS never filed its own income tax return, relying on the income tax exclusion for IRA sec. 17 corporations provided to BLREDCo.[11] In spite of respondent's attempts, the undeniable fact remains that MBS was not seeking to disguise its employment tax obligations. Respondent even admits that it was MBS' separate and distinct business activities that generated the tax liabilities at issue in these cases, not the activities of BLREDCo.[12]

---

[11]Moreover, it is telling that respondent does not suggest MBS' reliance on the income tax exclusion of BLREDCo is improper; respondent's introduction of the fact that MBS did not file Federal income tax returns is solely intended to confuse the issue.

[12]Although no party raised the issue, we find this analysis to be similar to our approach to alter ego cases. In determining whether an entity is merely the alter ego of another and therefore properly liable for its tax obligations we look at:

(continued...)

On this record we cannot accept respondent's argument that MBS forfeited its distinction as a legally separate division of BLREDCo permitted under the IRA sec. 17 charter. Accordingly, we hold that BLREDCo's IRA sec. 17 charter properly allowed it to create subdivisions whose assets and liabilities were distinct from those of the corporation.[13] We further hold that MBS was such a legally distinct division of BLREDCo at all relevant times, and consequently respondent may not look to BLREDCo to collect the employment tax liabilities owed by MBS. However, MBS remains liable to respondent for the employment taxes in issue, as reflected following concessions and stipulations by the parties.

---

[12](...continued)
(1) whether the alter ego treated the corporate assets as its own; (2) whether the alter ego held insurance covering the corporate assets; (3) whether corporate funds were used to pay the alter ego's expenses; (4) whether transactions between the corporation and the alter ego were at arm's length; and (5) whether the corporation and the alter ego have any separation in control. See Loving Saviour Church v. United States, 728 F.2d 1085, 1086 (8th Cir. 1984). In considering these factors, we find that MBS was not merely an alter ego of BLREDCo or vice versa. They operated as separate and legally distinct entities, and we will not hold BLREDCo liable for the obligations of MBS.

[13]Our holding is limited to an IRA sec. 17 corporation's ability to create divisions whose assets and liabilities are legally distinct for Federal tax purposes only.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner in docket No. 16150-17L</u>.

<u>Decision will be entered under Rule 155 in docket No. 16189-17L</u>.